# EXHIBIT A

ROBBINS GELLER RUDMAN
  & DOWD LLP
LAURIE L. LARGENT (153493)
DANIELLE S. MYERS (259916)
JENNIFER N. CARINGAL (286197)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
llargent@rgrdlaw.com
dmyers@rgrdlaw.com
jcaringal@rgrdlaw.com

Lead Counsel for Lead Plaintiff
Janice L. Kasbaum

POMERANTZ LLP
JENNIFER PAFITI (282790)
CARA DAVID (admitted *pro hac vice*)
600 Third Avenue
New York, NY 10016
Telephone: 212/661-1100
212/661-8665 (fax)
jpafiti@pomlaw.com
cdavid@pomlaw.com

Lead Counsel for Lead Plaintiffs
Betty Kalmanson, Lawrence Kalmanson,
and Shawn Kalmanson

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| In re GOODRX HOLDINGS, INC. SECURITIES LITIGATION | Master File No. 2:20-cv-11444-DOC-PD |
| | CLASS ACTION |
| This Document Relates To: | CORRECTED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| ALL ACTIONS. | DEMAND FOR JURY TRIAL |

[Caption continued on following page.]

4851-0300-4145.v1

BETTY KALMANSON, LAWRENCE KALMANSON, SHAWN KALMANSON, and JANICE L. KASBAUM Individually and on Behalf of All Others Similarly Situated,

Lead Plaintiffs,

vs.

GOODRX HOLDINGS, INC., DOUGLAS HIRSCH, TREVOR BEZDEK, KARSTEN VOERMANN, CHRISTOPHER ADAMS, JULIE BRADLEY, DIPANJAN DEB, ADAM KAROL, JACQUELINE KOSECOFF, STEPHEN LESIEUR, GREGORY MONDRE, AGNES REY-GIRAUD, MORGAN STANLEY & CO. LLC, GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, BARCLAYS CAPITAL INC., BOFA SECURITIES INC., CITIGROUP GLOBAL MARKETS INC., CREDIT SUISSE SECURITIES (USA) LLC, RBC CAPITAL MARKETS, LLC, UBS SECURITIES LLC, COWEN AND COMPANY, LLC, DEUTSCHE BANK SECURITIES INC., EVERCORE GROUP L.L.C., CITIZENS CAPITAL MARKETS, INC., KKR CAPITAL MARKETS LLC, LIONTREE ADVISORS LLC,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

[Caption continued on following page.]

4851-0300-4145.v1

RAYMOND JAMES & ASSOCIATES, INC., SVB LEERINK LLC, ACADEMY SECURITIES, INC., LOOP CAPITAL MARKETS LLC, R. SEELAUS & CO., LLC and SAMUEL A. RAMIREZ & COMPANY, INC.

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

4851-0300-4145.v1

Lead Plaintiffs, Betty Kalmanson, Lawrence Kalmanson and Shawn Kalmanson (collectively the "Kalmanson Family") and Janice L. Kasbaum ("Kasbaum" and together with the Kalmanson Family, "plaintiffs"), individually and on behalf of all others similarly situated, allege the following based upon information and belief as to the investigation conducted by plaintiffs' counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by GoodRx Holdings, Inc. ("GoodRx" or the "Company") and securities analyst reports, press releases, and other public statements issued by, or about, the Company. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE CLAIMS

1.      This is a federal securities class action brought on behalf of all purchasers of GoodRx Class A common stock (the "Class") between September 23, 2020 and May 10, 2021, inclusive (the "Class Period"), including those who purchased in, or traceable to, the Company's September 2020 initial public offering.  Plaintiffs are seeking to pursue remedies under §§11 and 15 of the Securities Act of 1933 (15 U.S.C. §§77k and 77o) (the "Securities Act"), and §§10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§78j(b) and 78t(a)) (the "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

2.      Based in Santa Monica, California, GoodRx's core business is a healthcare technology platform that provides consumers with current prescription drug prices and discounts to help them find the lowest cost pharmacy for their prescriptions.  GoodRx contracts with Pharmacy Benefit Managers ("PBMs") who provide GoodRx with the negotiated drug discounts the Company makes available to consumers.  Once the consumer finds the best prescription drug price on GoodRx's website or mobile app, a coupon is generated, similar to ones used at a grocery store, for the consumer to use at the participating pharmacy.  GoodRx is free to consumers;

- 1 -

4851-0300-4145.v1

the Company's core business makes money primarily through fees received from its contracted PBMs.

3.    GoodRx has been in business since 2011.  On August 28, 2020, the Company issued a press release announcing that it was launching an initial public offering ("IPO").  Defendants completed GoodRx's IPO on September 23, 2020, raising more than $1 billion in gross proceeds from public investors, of which $349 million went to GoodRx insiders Andrew Slutsky, the Company's Consumer President; Idea Men, LLC, an entity owned by defendants Douglas Hirsch and Trevor Bezdek; and Spectrum Equity VII, L.P., an entity whose managing directors included defendant Stephen LeSieur.  Collectively, the Company, its insiders and certain selling stockholders sold a total of 34.6 million shares of GoodRx Class A common stock at $33 per share.  Boyed by investors' confidence in the Company, when GoodRx stock began trading on September 23, 2020, it opened at almost $47 per share, 39% above its per share offering price.

4.    The IPO, however, was effectuated by means of a materially misleading Registration Statement (defined herein) and prospectus.  Specially, the Registration Statement and prospectus issued in connection with the IPO repeatedly touted GoodRx's competitive advantage, portraying the Company as a "market leader with significant scale and brand advantage over our competitors" and boasted about the Company's partnerships across the healthcare industry, its "deep competitive moat" and the "highly competitive prices" it offered.  The Registration Statement also assured investors that GoodRx had contract provisions in place that "prevent[ed] PBMs from circumventing our platform, redirecting volumes outside of our platform and other protective measures" and that for many of its PBM partners GoodRx was their only "significant direct-to-consumer channel."

5.    But contrary to these self-described competitive advantages and assurances GoodRx had the market locked up with its PBM partners, at the time of the IPO, tech giant Amazon.com, Inc. was preparing to enter the market.  In fact, Amazon

- 2 -

was partnering with Inside Rx, a subsidiary of Express Scripts, one of the nation's top three PBMs, to launch its own prescription drug discount program for millions of Amazon Prime members, which would compete directly with GoodRx, by giving consumers the same access to prescription discounts at thousands of pharmacies nationwide, including major chains.

6. While investors were in the dark about the imminent competition GoodRx was facing from Amazon, defendants knew at the time of the IPO that Amazon was getting ready to introduce its own competing product because GoodRx itself was a founding partner of Inside Rx, along with Express Scripts, and, GoodRx had long partnered with Amazon's subsidiary PillPack, thus giving defendants access to inside information about Amazon's initiatives before investors were made aware of them. Indeed, after the news about Amazon's intentions were initially announced, defendants admitted to a long standing partnership with Inside Rx and as partners with Amazon, they regularly communicated with the Company's soon to be competitor.

7. Armed with this inside information about Amazon's plans, defendants pushed to complete the IPO, raising more than $1 billion from public investors, with $349 million going to GoodRx insiders.

8. However, within just weeks of the IPO, investors began learning the truth about the direct competition GoodRx was facing from Amazon, a company that exceeded GoodRx in both scale and marketing dollars. On November 17, 2020 Amazon publicly announced Amazon Pharmacy and the offering of a new prescription drug savings program, PrimeRx, which was identical to GoodRx's core business. Amazon announced that through PrimeRx its millions of Amazon Prime members could access prescription drug savings of up to 80% at thousands of pharmacies nationwide, almost identical to GoodRx's discount model. In response to Amazon's announcement, GoodRx's stock price plummeted 23% on the highest trading volume day since the Company went public just weeks earlier.

- 3 -

4851-0300-4145.v1

9.     Following Amazon's announcement, defendants immediately sought to downplay the threat the tech giant's entry into the market posed to GoodRx and continued to make materially misleading statements in conference calls with investors by failing to disclose that Amazon was continuing expand its PrimeRx product and would soon introduce a drug price comparison tool identical to GoodRx's and add thousands of additional participating pharmacies to its network.

10.     The truth about Amazon's continued expansion in the prescription drug discount market came out on May 11, 2021, when Amazon announced an upgrade to PrimeRx whereby, like GoodRx, consumers could compare prescription drug prices online and that PrimeRx was adding an additional 10,000 participating pharmacies to its discount program.  In response to the news that Amazon's competitive efforts were becoming more aggressive, GoodRx's stock price dropped almost 8% over the next two trading days, to a price below the $33 per share IPO price, showing that GoodRx's IPO price did not accurately represent its actual value.  Combined, these revelations about the true competitive risk GoodRx was facing at the time of the IPO erased over $600 million of the Company's market capitalization, while GoodRx insiders collectively sold $349 million worth of GoodRx common stock in the IPO.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5), and §§11 and 15 of the Securities Act (15 U.S.C. §§77k and 77o). This Court has jurisdiction over the subject matter of this action under §27 of the Exchange Act (15 U.S.C. §78aa), §22 of the Securities Act (15 U.S.C. §77v) and 28 U.S.C. §1331 because this is a civil action arising under the laws of the United States of America.

12.     Venue is proper in this District under §27 of the Exchange Act, §22 of the Securities Act and 28 U.S.C. §1391(b)-(d).  The Company maintains its principal executive offices in this District, and many of the acts charged herein, including the

- 4 -

4851-0300-4145.v1

dissemination of materially false and misleading information, occurred in substantial part in this District.

13.     In connection with the acts alleged in this complaint, defendants directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the U.S. mail, interstate telephone and other electronic communications and the facilities of the NASDAQ Global Select Market ("NASDAQ"), a national securities exchange.

**CLASS ACTION ALLEGATION**

14.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of purchasers of GoodRx Class A common stock during the Class Period.  Excluded from the Class are defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

15.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, GoodRx shares were actively traded on the NASDAQ.  While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are thousands of members in the proposed Class, if not more.  As of March 31, 2021, the Company reported 69,555,726 shares of Class A common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by GoodRx, its transfer agent or securities' brokers, and may be notified of the pendency of this action electronically or by mail, using the form of notice similar to that customarily used in securities class actions.

16.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

- 5 -

4851-0300-4145.v1

17.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

18.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of GoodRx;

(c)    whether the price of GoodRx common stock was artificially inflated during the Class Period; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

19.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**SECURITIES ACT CLAIMS**

**A.    The Securities Act Parties**

20.    Plaintiff the Kalmanson Family was appointed Lead Plaintiff on April 8, 2021.   An updated certification reflecting the Kalmanson Family's relevant transactions in GoodRx Class A common stock with respect to the operative Class Period is attached hereto.

- 6 -

4851-0300-4145.v1

21.     Defendant GoodRx is a holding company that owns and operates a U.S. consumer-focused digital healthcare platform.  The Company maintains its principal executive offices in Santa Monica, California and its common stock is listed and trades on the NASDAQ under the ticker symbol GDRX.

22.     Defendant Hirsch is, and was at all relevant times, Co-Chief Executive and a director of GoodRx.

23.     Defendant Bezdek is, and was at all relevant times, Co-Chief Executive and a director of GoodRx.

24.     Defendant Karsten Voermann is, and was at all relevant times, Chief Financial Officer of GoodRx.

25.     Defendants Hirsch, Bezdek and Voermann are collectively referred to hereinafter as the "Individual Defendants."

26.     Defendant Christopher Adams was a director of the Company at all relevant times.  Adams signed the false and misleading registration statement.

27.     Defendant Julie Bradley was a director of the Company at all relevant times.  Bradley signed the false and misleading registration statement.

28.     Defendant Dipanjan Deb was a director of the Company at all relevant times.  Deb signed the false and misleading registration statement.

29.     Defendant Adam Karol was a director of the Company at all relevant times.  Karol signed the false and misleading registration statement.

30.     Defendant Jacqueline Kosecoff was a director of the Company at all relevant times.  Kosecoff signed the false and misleading registration statement.

31.     Defendant Stephen LeSieur was a director of the Company at all relevant times.  LeSieur signed the false and misleading registration statement.

32.     Defendant Gregory Mondre was a director of the Company at all relevant times.  Mondre signed the false and misleading registration statement.

33.     Defendant Agnes Rey-Giraud was a director of the Company at all relevant times.  Rey-Giraud signed the false and misleading registration statement.

- 7 -

4851-0300-4145.v1

34.    The defendants referenced above in ¶¶26-33 are collectively referred to herein as the "Director Defendants."

35.    Defendants Morgan Stanley & Co. LLC, Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Barclays Capital Inc., BofA Securities Inc., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, RBC Capital Markets, LLC, UBS Securities LLC, Cowen and Company, LLC, Deutsche Bank Securities Inc., Evercore Group L.L.C., Citizens Capital Markets, Inc., KKR Capital Markets LLC, LionTree Advisors LLC, Raymond James & Associates, Inc., SVB Leerink LLC, Academy Securities, Inc., Loop Capital Markets LLC, R. Seelaus & Co., LLC and Samuel A. Ramirez & Company, Inc. (collectively the "Underwriter Defendants") served as underwriters of the Company's IPO, and participated in the preparation and dissemination of GoodRx's false and misleading Registration Statement.

36.    The Underwriter Defendants served as the underwriters of GoodRx's IPO and had access to confidential information concerning GoodRx's business, including its competitors and competitive pressures, during their due diligence investigation, participated in the preparation and dissemination of GoodRx's false and misleading Registration Statement and caused the Registration Statement containing the false and misleading statements to be filed with the SEC and declared effective.

**B.    Background Allegations**

**1.    GoodRx's Business**

37.    Nearly a decade ago, defendant Hirsch, a former Facebook Inc. executive, and defendant Bezdek created what has now become a popular and fast-growing digital U.S. prescription drug shopping platform designed to aid people in finding the lowest prescription drug prices in their local areas.  In October 2015, GoodRx acquired 100% of the outstanding shares of GoodRx, Inc., the entity that owns and operates the digital shopping platform created by defendants Hirsch and Bezdek.

- 8 -

4851-0300-4145.v1

38.    GoodRx's core business is a digital platform that provides consumers free access to discounted prescription drug prices.  According to the Company's website, consumers can use GoodRx's platform to save up to 80% on most prescription drugs at over 70,000 U.S. pharmacies.  Through GoodRx's digital platform consumers can compare drug prices and find the lowest cost pharmacy for their prescriptions.  The Company provides consumers with these services via a mobile app and website that display prices and discounts at local and mail-order pharmacies for both insured and uninsured Americans.  While the Company also generates revenue from subscription, advertising and telehealth services, at the time of the IPO, GoodRx generated over 90% of its revenues from its prescription drug discount program.

39.    Because GoodRx's prescription drug discount program is free to consumers, the revenue the Company earns from its core business is primarily paid by PBMs who maintain non-insurance cash networks with pharmacies.  The categories and brands of medication, as well as the pricing, that GoodRx publishes for consumers are determined by the Company's contracted PBMs; essentially GoodRx's PBMs contracts allow the Company to market the PBMs negotiated rates through the Company's platform.  GoodRx aggregates the discounted drug prices negotiated by the PBMs and shows the lowest available price for each pharmacy/drug combination on its website and mobile app.  GoodRx's platform generates a "GoodRx code" that allows consumers free access to the discounted drug prices when the code is presented at the chosen pharmacy.  The PBMs' GoodRx contracts will either pay GoodRx on a percentage of the fee arrangement or a fixed fee per transaction arrangement.  Under the percentage of the fee arrangement, when a consumer uses the GoodRx code to fill a prescription, the pharmacy pays the PBM whose pricing is used, with a majority of that fee shared with GoodRx.  Under both arrangements, the more volume that goes through the GoodRx platform, the more revenue the Company generates.

- 9 -

4851-0300-4145.v1

40.    At the time of the IPO, because there was a significant concentration of PBMs in the U.S. healthcare industry, a limited number of PBMs generated a significant portion of GoodRx's revenue and the discount prices GoodRx published on its platform.  For example, in the Registration Statement, GoodRx reported that the Company's three largest PBM partners accounted for 48% of the Company's revenue in the first half of 2020 and that PBMs Navitus, MedImpact and Express Scripts each accounted for more than 10% of revenue in the same period.

41.    GoodRx uses a key metric called "Monthly Active Consumers" ("MAC") to measure and report the growth of the Company's prescription drug program.  MAC refers to the number of unique consumers who have used a GoodRx code to purchase prescription medication in a given calendar month.  At the time of the IPO, GoodRx reported 4.4 million MACs for the second quarter of 2020.

**2.    Defendants Conduct GoodRx's IPO**

42.    On August 28, 2020, GoodRx filed with the SEC a Form S-1 Registration Statement (the "Registration Statement"), which, following amendments, was declared effective by the SEC on September 22, 2020.

43.    On September 22, 2020, GoodRx announced the pricing of its IPO of 34.6 million shares of its Class A common stock at an initial public offering price of $33 per share.  The Company announced that of the shares offered, 23.4 million were being offered by the Company and 11.2 million shares were being offered by certain of GoodRx's insiders and selling shareholders.  In addition, GoodRx agreed to give the Underwriter Defendants a 30-day option to purchase an additional 5.2 million shares of Class A common stock from GoodRx at the initial offering price, which the Underwriter Defendants exercised.

44.    On September 23, 2020, GoodRx and the Underwriter Defendants conducted the IPO and sold 39.8 million shares of GoodRx's Class A common stock to the investing public.  These shares were sold pursuant to a final prospectus filed September 24, 2020, with the SEC, which forms part of the Registration Statement.

- 10 -

4851-0300-4145.v1

45.    On September 25, 2020, GoodRx closed its IPO, which was one of the 20 largest IPOs in 2020.  GoodRx's IPO was also a rarity among start-ups filing to go public because, unlike many other digital health companies that had gone public before it, GoodRx had been consistently profitable since 2016.

46.    In sum, the IPO allowed the Company, GoodRx insiders and certain existing stockholders to sell over 39.8 million Class A common shares for $33 per share, including the full exercise of the Underwriter Defendants' option, generating over $1.3 billion in gross offering proceeds.

### 3.    At the Time of the IPO, GoodRx Was Facing a Material Risk of Competition from Amazon

47.    Unbeknownst to investors, the Registration Statement failed to disclose that GoodRx's core business was facing material risk of competition from tech giant Amazon.  At the time of the IPO, Amazon was developing and planning the imminent launch of an online pharmacy offering at Amazon.com and PrimeRx, a prescription drug savings program for its millions-of Amazon Prime members that mirrored GoodRx's own prescription drug discount program.

48.    At the time of the IPO, Amazon was partnering with Inside Rx (a business unit of Express Scripts), to launch its PrimeRx product.  Through Amazon's partnership with Inside Rx, a cross-industry partnership between Express Scripts, GoodRx, pharmaceutical manufacturers and participating pharmacies across the county, Amazon would be able to compete directly with GoodRx by offering its Amazon Prime members the identical savings benefit as GoodRx – up to 80% off prescription drugs that could be used at thousands of pharmacies nationwide, including major chains, most of whom were also in GoodRx's network of pharmacies.

49.    Given Amazon's size and access to millions of Amazon Prime members, Amazon's entry into the prescription drug discount market, with Inside Rx as its partner, was a material competitive threat to GoodRx's core business.  As discussed below, the materiality to investors of a competitor the size of Amazon was

- 11 -

4851-0300-4145.v1

demonstrated when GoodRx's stock price dropped a stunning 23% following Amazon's announcement that it was entering the prescription drug discount market and another 8% when Amazon subsequently made an announcement showing it was taking more aggressive steps to compete with GoodRx.

50.    Through their close business relationships with Amazon, Inside Rx and Express Scripts, defendants knew of Amazon's imminent launch of PrimeRx at the time of the IPO.  GoodRx was a founding partner in Inside Rx along with Express Scripts, who was also one of GoodRx's largest PBMs.  In May 2017 GoodRx partnered with Express Scripts, and other cross-industry partners, to launch Inside Rx. After Amazon disclosed its entry into the prescription drug discount market, defendants repeatedly touted GoodRx's existing partnership with Inside Rx and the fact that it was one of the launch partners of Inside Rx.  For example, on November 18, 2020, the day after Amazon made its announcement, during an investor conference call defendants admitted that GoodRx was a "founding partner of Inside Rx.  In fact, we've worked with them for quite some time."

51.    Additionally, at the time of the IPO, GoodRx had been in an ongoing two-year partnership with Amazon's subsidiary, PillPack, an online pharmacy Amazon acquired in 2018.  As defendants admitted during investor conference calls following Amazon's announcement, defendants communicated regularly with Amazon through this partnership.  For example, during a December 3, 2020 investor conference call, Hirsch confirmed GoodRx's pre-IPO partnership with Amazon, stating: "I'm very happy to be partnered with Amazon. We communicate with them regularly."  Additionally, on a December 3, 2020 investor conference call, Hirsch admitted that since 2018 GoodRx had partnered with Amazon in providing customers of PillPack with GoodRx discounts and acknowledged that "we're both personal and professional friends with PillPack."

52.    While failing to disclose the material competitive risk GoodRx was facing from Amazon's imminent entry into the prescription drug discount market, the

- 12 -

4851-0300-4145.v1

Registration Statement assured investors that GoodRx had a competitive advantage, portraying the Company as a "***market leader with a significant scale and brand advantage over our competitors***"[1] and boasted about the Company's partnerships across the healthcare industry and its "***deep competitive moat***."   Defendants also touted that GoodRx had been the "***most downloaded medical app on the Apple App Store and Google Play App Store***" for the three years prior to the IPO.

53.   The Registration Statement also highlighted the size of GoodRx's database and competitive prices stating: "***The size of our database, combined with our proprietary platform, allows us to present highly competitive prices to consumers.  We believe that we currently have the largest database of PBM prices in the United States***."   The Registration Statement also stated that for many of GoodRx's PBM partners, the Company was "***their only significant direct-to-consumer channel***."

54.   Analysts who initiated coverage of GoodRx common stock shortly following the IPO noted the importance of GoodRx's competitive advantage and the potential risk to GoodRx if a large retail competitor such Amazon were to enter the prescription drug discount card market.  For example, on October 19, 2020, Deutsche Bank issued a report initiating coverage with a target price of $50 per share, noting that: "GoodRx does not face a lot of competition . . . ."; the "company is the only scale player in prescription drug price comparison"; and GoodRx "is the leader (by a large margin) among pharma discount card providers in the country."  The Deutsche Bank report also noted that a key risk to GoodRx's story was that "other internet players (*e.g.* Amazon or Google) [could] get into the price discovery market for drugs and/or provide heavily discounted drugs themselves."  Similarly, on October 19, 2020, Cowen issued a report initiating coverage of GoodRx stock with a target price of $63 per share and an outperform rating, noting, "[w]ith 15M monthly visitors and 4.9M

---

[1]   Unless otherwise noted, all emphasis herein is added.

- 13 -

monthly active consumers, [GoodRx] has the scale leverage that its competitors lack, allowing it to negotiate more favorable pricing terms with PBMs" and "[w]e believe there are no true pure-play competitors to GoodRx that are formidable and at scale." Additionally, RBC Capital Markets issued a report on October 18 2020, noting:

> GoodRx currently commands a leading market position among its peers in the core Discount Card space with 4.4MM Monthly Active Consumers and over 15MM Monthly Visitors to the platform, has an impressive scale contracting with over a dozen PBMs with its services accepted at a vast majority of pharmacies in the country,

and also noting the risk that "large retail pharmacies like Walmart, CVS and Walgreens as well as Amazon – all of which well exceed GoodRx in both scale and marketing wallet – could threaten the company's leadership and [competitive] moat if they were to lean into the space."

### 4. Within Just Weeks of the IPO, Amazon Begins Announcing the Launch of Amazon Pharmacy and PrimeRx

55. On November 17, 2020, Amazon announced what the Registration Statement failed to disclose; that tech giant Amazon was launching PrimeRx, a prescription drug discount program identical to GoodRx's for all Amazon Prime members that enabled access to negotiated PBM pricing for prescriptions filled at Amazon's own pharmacy and 50,000 retail pharmacies nationwide. In response to this news, the price of GoodRx's stock dropped from $46.72 per share at the close of trading on November 16, 2020, to $36.21 per share at the close of trading on November 17, 2020, a drop of $10.51, or 23%, on a trading volume of over 23 million shares, the largest trading volume since the Company's IPO.

56. Just six months later Amazon made another announcement about its PrimeRx product that again caused investors concern about the competitive risk posed by Amazon entering the prescription drug discount market. On May 11, 2021, Amazon announced the addition of new features to its PrimeRx product that, like

- 14 -

4851-0300-4145.v1

GoodRx, allows consumers to compare prescription prices at over 60,000 pharmacies nationwide. In response to this news, GoodRx's stock price dropped another $1.06 from a close of $31.45 per share on May 10, 2021 to close of $30.59 per share on May 11, 2021 and continued to drop on May 12, 2021 to close at $29.48 per share, for a two day drop of almost 8% showing that GoodRx's IPO price did not accurately represent its actual value. When GoodRx announced its first quarter earnings just two days later on May 13, 2021, the Company's stock price was still trading below the IPO price of $33 per share.

**C.     Defendants' Materially False and Misleading Statements and Omissions in the Registration Statement**

57.     The Registration Statement contained materially false and misleading statements about GoodRx's competitive positioning, stating, in pertinent part:

*Our partnerships across the healthcare ecosystem, scale and strong consumer brand create a deep competitive moat that is reinforced by our proprietary technology platform*, which processes over 150 billion pricing data points every day and integrates that data into an interface that is convenient and easy to use for consumers.

58.     Similarly, the Registration Statement stated, in pertinent part: "*We are a market leader with a significant scale and brand advantage over our competitors. Our growth accelerates self-reinforcing network effects that further strengthen our competitive position*."

59.     The Registration Statement also identified various competitive advantages which purportedly "set[] [GoodRx] [a]part," stating, in pertinent part:

**What Sets Us Apart**

*We are a market leader with a significant scale and brand advantage over our competitors. Our growth accelerates self-reinforcing network effects that further strengthen our competitive position. Our competitive strengths consist of*:

- 15 -

4851-0300-4145.v1

- *Leading Platform:*  We believe that we are the largest platform that aggregates pricing for prescriptions.  Our proprietary platform enables us to collect and normalize over 150 billion prescription pricing data points every day from sources spanning the healthcare industry.

- *Trusted Brand:*  We have built a trusted brand based on nearly a decade of consumer-focused product development.  We strive to be with the consumer throughout their healthcare journey.  We are guided by the principle of doing well for consumers and the healthcare industry as a whole, which we believe helps us build trust, engagement and brand loyalty.

- *Scaled and Growing Network:* Our leading consumer-focused digital healthcare platform and brand have facilitated rapid growth in our consumer base, which has helped us achieve significant scale. As we have scaled, we have been able to increase the savings that we provide our consumers, in part by leveraging our growing consumer base to attract more partners and source better prices.

- *Consumer-focus:* We empower consumers with the tools and resources to navigate the complexity of the healthcare system. Our platform delivers a consumer-first experience that is convenient and is easy to use and understand.

- *Extensible Platform:* The large number of highly engaged consumers who trust our brand and platform provide a strong foundation for the development of new products that extend across the healthcare market.  We have demonstrated our ability to develop new products such as our subscription offerings and

- 16 -

4851-0300-4145.v1

pharmaceutical manufacturer solutions offering, and integrate acquired companies such as HeyDoctor.

- ***Cash Generative Monetization Model:*** We believe our business model has facilitated the rapid growth and expansion of our platform. We have a track record of generating cash flows, allowing us to reinvest in platform expansion and growth.

60. The Registration Statement also touted the Company's 4.4 million MACs for the second quarter of 2020 and that GoodRx had been "the most downloaded medical app on the Apple App Store and Google Play App Store for the last three years."

61. The Registration Statement also highlighted the size of GoodRx's database and competitive pricing. The Registration Statement stated: "The size of our database, combined with our proprietary platform, allows us to present highly competitive prices to consumers. We believe that we currently have the largest database of PBM prices in the United States."

62. The Registration Statement also touted that: "For many of our PBM partners, we are their only significant direct-to-consumer channel. To date, we have retained all of our PBM partners, which highlights the strength of our relationships alongside the value we deliver."

63. The Registration Statement also assured investors that GoodRx had contract provisions in place with its PBMs that "prevent PBMs from circumventing our platform, redirecting volumes outside of our platform and other protective measures."

64. The Registration Statement also stated: "We believe our financial results reflect the significant market demand for our offerings and the value that we provide to the broader healthcare ecosystem."

65. In addition, the Registration Statement provided generic statements of potential competitive pressures that "may" or "could" impact GoodRx's business in

- 17 -

4851-0300-4145.v1

the future, but failed to disclose the imminent and known direct competitor that was being developed by Amazon at the time of the IPO, which would have severe negative consequences for GoodRx's business, operations and financial prospects. Indeed, the Registration Statement did not even identify Amazon as a potential competitor, instead stating in pertinent part:

> We compete with companies that provide savings on prescriptions, as well as companies that offer telehealth services and advertising and market access for pharmaceutical manufacturers. Within the prescriptions market, our competition is fragmented and consists of competitors that are smaller than us in scale. There can be no assurance that competitors will not develop and market similar offerings to ours, or that industry participants, such as integrated PBMs and pharmacy providers, will not seek to leverage our platform to drive consumer demand and traffic to their networks and eventually away from, or outside of, our platform. We *may* face increased competition from those that attempt to replicate our business model or marketing tactics, such as discount websites, apps, cash back and loyalty programs and new comparison shopping sites from various industry participants, any of which *could* impact our ability to attract and retain consumers.

66.    The statements referenced in ¶¶57-65 above were materially false and misleading when made because they misrepresented and failed to disclose the adverse facts about Amazon's imminent entry into the prescription drug saving market with PrimeRx. Specifically, the Registration Statement failed to disclose that Amazon had been in the process of developing and would soon begin introducing its own prescription drug saving program, PrimeRx, in partnership with Inside Rx and as such would be able to offer the same prescription drug discounts to its millions of Amazon Prime members that GoodRx was also offering.

- 18 -

4851-0300-4145.v1

67. On November 17, 2020, just weeks after GoodRx completed its IPO, Amazon announced two new pharmacy offerings, a PrimeRx plan and a discount card program, which, among other things, would compete directly with GoodRx's platform by making it "simple for customers to compare prices and purchase medications for home delivery, all in one place." The Amazon press release stated, in pertinent part:

> Amazon.com, Inc. (NASDAQ: AMZN) today announced two new pharmacy offerings to help customers conveniently purchase their prescription medications. Amazon Pharmacy, a new store on Amazon, allows customers to complete an entire pharmacy transaction on their desktop or mobile device through the Amazon App. Using a secure pharmacy profile, customers can add their insurance information, manage prescriptions, and choose payment options before checking out. Prime members receive unlimited, free two-day delivery on orders from Amazon Pharmacy included with their membership. . . .

> Also new today, Prime members can access savings on medications at Amazon Pharmacy when paying without insurance, as well as at over 50,000 other participating pharmacies nationwide. The Amazon Prime prescription savings benefit saves members up to 80% off generic and 40% off brand name medications when paying without insurance. Prime members will have access to their prescription savings at checkout on Amazon Pharmacy, or can learn more at amazon.com/primerx.

> Together the Amazon Prime prescription savings benefit and Amazon Pharmacy make it simple for customers to compare prices and purchase medications for home delivery, all in one place.

68. That same day, CNBC.com reported that Amazon Prime members would now have access to discounts of up to 80% on generic medications and up to 40% on

- 19 -

4851-0300-4145.v1

brand-name prescriptions through its relationship with the Inside Rx savings program. This competitive pricing posed a severe threat to GoodRx's business model.

69.    In response to this news, the price of GoodRx common stock declined 23%, from $46.72 per share to $36.21 per share by market close on November 17, 2020, on extremely heavy trading volume of over 23 million shares traded.  Prior to the disclosure of the adverse facts detailed above, Andrew Slutsky, the Company's Consumer President; Idea Men, LLC, an entity whose managing members included defendants Hirsch and Bezdek; and Spectrum Equity VII, L.P., an entity whose managing directors included defendant LeSieur, collectively sold $349 million worth of GoodRx common stock in the IPO.

70.    After Amazon's PrimeRx was made public, securities analysts downgraded and slashed price targets on GoodRx common shares on fears that Amazon's pharmacy offerings would materially impact the Company's business and that GoodRx's price saving tools could be made irrelevant by Amazon's discounts. For example, J.P. Morgan analysts downgraded GoodRx shares to underweight with a $29 price target, citing pressure from Amazon's PrimeRx plan and discount card program.  Similarly, Deutsche Bank also cut its GoodRx target price from $50 to $31 and maintained a hold rating.

71.    Then, on May 11, 2021, Amazon made another announcement about its PrimeRx product that again caused investors concern about the competitive risk posed by Amazon entering the prescription drug discount market.  Amazon announced the addition of new feature to its PrimeRx product that, like GoodRx, allows consumers to compare prescription prices at over 60,000 pharmacies nationwide.  In response to this news, GoodRx's stock price dropped another $1.06 from a close of $31.45 per share on May 10, 2021 to close of $30.59 per share on May 11, 2021 and continued to drop on May 12, 2021 to close at $29.48 per share, for a two day drop of almost 8%.  When GoodRx announced its first quarter earnings just two days later on May 13, 2021, the Company's stock price was still trading below the IPO price of $33 per share.

- 20 -

4851-0300-4145.v1

72.     Defendants were under a duty to disclose the full truth about the nature of the competition GoodRx would be facing with Amazon's imminent entry in the online pharmacy industry and prescription drug discount market, such that any statement or omission the Registration Statement made to the contrary would not have been misleading.  Defendants breached this duty by failing to fully reveal this information and, instead omitting and concealing it from investors. This information was material because it would have altered the total mix of information about the Company that was available to reasonable investors.

73.     Defendants violated Item 303 of Regulation S-K, 17 C.F.R. §229.303 ("Item 303") based on their failure to disclose the true nature of the competitive risk GoodRx was facing with regard to Amazon.  Item 303 requires an issuer to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. §229.303(b)(2)(ii).

74.     The SEC has explained, "[o]ne of the most important elements necessary to an understanding of a company's performance, and the extent to which reported financial information is indicative of future results, is the discussion and analysis of known trends, demands, commitments, events and uncertainties."  Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 33-8350, 68 Fed. Reg. 75,056, 75,061 (Dec. 29, 2003).  Thus, SEC guidance requires management to make two assessments where a trend or uncertainty is known:

(1) Is the known trend . . . or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.

(2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend . . . or uncertainty, on the assumption that it will come to fruition.  Disclosure is

- 21 -

4851-0300-4145.v1

then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

*See* Certain Investment Company Disclosures, Securities Act Release No. 33-6835, 54 Fed. Reg. 22,427, 22,430 (May 24, 1989) (the "1989 SEC Release").

75. The SEC has made clear for decades that, in addition to the identification of such "known trends or uncertainties," Item 303 specifically requires disclosure of the expected impact that any such trends or uncertainties are expected to have on a company's prospective financial performance. The SEC has stated that "Item 303 require[s] disclosure of forward-looking information," including, at a minimum, disclosure of the "reasonably likely material effects on operating results." 1989 SEC Release at 22,428-29.

76. Here, the defendants violated Item 303 by failing to disclose a known uncertainty with respect to the risk of competition GoodRx was facing with Amazon's imminent entry in the online pharmacy industry and prescription drug discount market.

77. Similarly to Item 303, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105, requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the most material factors that make an investment in the registrant or offering speculative or risky" and requires each risk factor to "adequately describe[] the risk."

78. GoodRx's failure to disclose the imminent risk of competition from Amazon violated 17 C.F.R. §229.105 because this factor created a significant risk that was not adequately disclosed, or disclosed at all, even though it was a significant factor that made an investment in GoodRx speculative or risky. Indeed, as discussed about, the risk factors that were provided in the Registration Statement were themselves materially misleading because they provided generic statements of

- 22 -

4851-0300-4145.v1

potential or contingent risk yet failed to disclose that the potential future adverse impacts described were already occurring.

**D.      Causes of Action**

## COUNT I

### Violations of §11 of the Securities Act
### (Against All Defendants)

79.      Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  With respect to this Count, plaintiffs exclude allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and/or negligence.

80.      By reason of the conduct herein alleged, each defendant named in this Count violated §11 of the Securities Act.

81.      For all the reasons set forth above, the Registration Statement contained untrue statements of material fact and omitted material facts necessary to make the statements made therein not false or misleading.

82.      On September 23, 2020, GoodRx conducted its IPO pursuant to SEC Form S-1 which GoodRx filed with the SEC on August 28, 2020, and after the filing of amendments thereto, was declared effective on or about September 22, 2020.

83.      Plaintiffs purchased GoodRx Class A common stock traceable to the Registration Statement.

84.      GoodRx is the registrant for the IPO.  As issuer of the Class A common stock, GoodRx is strictly liable to plaintiffs and the Class for the misstatements and omissions in the Registration Statement.

85.      In the exercise of reasonable care, each of the defendants named herein, should have known of the misstatements and omissions contained in the Registration Statement as set forth above in ¶¶57-65.

86.      Each of the Individual and Director Defendants signed the Registration Statement.  None of the Individual or Director Defendants conducted a reasonable

- 23 -

4851-0300-4145.v1

investigation or possessed reasonable grounds to believe that the Registration Statement did not contain untrue statements of material fact or omit material facts necessary to make the statements made therein not false or misleading.

87.    The Underwriter Defendants served as underwriters of the IPO.  The Underwriter Defendants did not conduct a reasonable investigation or possess reasonable grounds to believe that the Registration Statement did not contain untrue statements of material fact or omit material facts necessary to make the statements made therein not false or misleading.

88.    Plaintiffs and members of the Class sustained damage as a result of the violations alleged herein.

89.    Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time this action was commenced.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time this action was commenced.

## COUNT II

### Violations of §15 of the Securities Act
### (Against the Individual Defendants)

90.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  Plaintiffs exclude allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and/or negligence.

91.    By reason of the conduct alleged herein, the Individual Defendants violated §15 of the Securities Act.  Each of the Individual Defendants was a control person of GoodRx by virtue of his or her position as an owner, director and/or senior officer of GoodRx.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or were major shareholders of GoodRx.

- 24 -

4851-0300-4145.v1

92.     Each of the Individual Defendants was a participant in the violations of §11 of the Securities Act alleged in the Counts above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process by which the IPO was completed.

## EXCHANGE ACT CLAIMS

### A.     The Exchange Act Parties

93.     Plaintiff the Kalmanson Family was appointed Lead Plaintiff on April 8, 2021.    An updated certification reflecting the Kalmanson Family's relevant transactions in GoodRx Class A common stock with respect to the operative Class Period is attached hereto.

94.     Plaintiff Kasbaum was appointed Lead Plaintiff on April 8, 2021.  As set forth at ECF Nos. 29-2 and 29-3, Kasbaum purchased GoodRx Class A common stock during the Class Period and has been damaged thereby.

95.     Defendant GoodRx is a holding company that owns and operates a U.S. consumer-focused digital healthcare platform.  The Company maintains its principal executive offices in Santa Monica, California and its common stock is listed and trades on the NASDAQ under the ticker symbol "GDRX."

96.     Defendant Hirsch is, and was at all relevant times, Co-Chief Executive and a director of GoodRx.

97.     Defendant Bezdek is, and was at all relevant times, Co-Chief Executive and a director of GoodRx.

98.     Defendant Voermann is, and was at all relevant times, Chief Financial Officer of GoodRx.

99.     Each defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of GoodRx common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding GoodRx's business, operations, services, competition, competitive market

- 25 -

4851-0300-4145.v1

trends and present and future business prospects; (ii) facilitated the Company's September 2020 IPO; (iii) created artificial demand for the GoodRx common shares sold in the IPO; (iv) enabled the Company to raise more than $1 billion from public investors ($887 million in net proceeds), from the sale of GoodRx common stock in the IPO; (v) enabled certain existing shareholders, including affiliates of Hirsch and Bezdek, executive officers and Company employees, to collectively reap gross proceeds of more than $369 million from the sale of GoodRx common stock in the IPO; and (vi) caused plaintiffs and the Class to purchase GoodRx publicly traded common stock at artificially inflated prices.

## B.    False and Misleading Statements and Omissions of Material Facts

100.   Plaintiffs incorporate by reference all of the allegations contained above in ¶¶37-71, as each of the statements and omissions that rendered the Registration Statement false and misleading also give rise to liability under the Exchange Act against defendants GoodRx, Hirsch, Bezdek and Voermann.  Each of the statements and omissions described in ¶¶57-65 were knowingly or recklessly false when made by the defendants because each defendant knew, but failed to disclose, that at the time of the IPO, Amazon was developing and would soon begin introducing Amazon Pharmacy and PrimeRx, a service that would directly compete with GoodRx.

101. Defendants timed the IPO so that it was priced before Amazon announced its online pharmaceutical business and PrimeRx to facilitate the IPO and create artificial demand for the common shares sold therein, as well to maximize the amount of money the Company and the selling stockholders could raise in the IPO. Given defendants' knowledge of Amazon's intention to enter the online pharmaceutical business and introduce PrimeRx, and their misleading statements about GoodRx's competitive position made contemporaneously with that knowledge, defendants' materially false and/or misleading statements alleged herein were made willfully and caused GoodRx common stock to trade at artificially inflated prices

- 26 -

4851-0300-4145.v1

during the Class Period and caused damages to members of the Class when the truth was belatedly disclosed as detailed below.

102.   In October 2020, several investment firms initiated analyst coverage of the Company (including some of the Underwriter Defendants of the IPO), with reports noting the importance of GoodRx's competitive advantage and the potential risk to GoodRx if a large competitor such Amazon were to enter the prescription drug discount card market.  For example, on October 19, 2020, Deutsche Bank issued a report initiating coverage with a target price of $50 per share, noting that: "GoodRx does not face a lot of competition . . . ."; the "company is the only scale player in prescription drug price comparison"; and GoodRx "is the leader (by a large margin) among pharma discount card providers in the country."  The Deutsche Bank report also noted that a key risk to GoodRx's story was that "other internet players (e.g. Amazon or Google) [could] get into the price discovery market for drugs and/or provide heavily discounted drugs themselves."

103.   Following issuance of the Registration Statement and closing of the IPO, on November 12, 2020, GoodRx made its first earnings announcement as a publicly traded company.  On that day GoodRx issued a press release announcing its financial results for the third quarter of 2020, the period ended September 30, 2020, and held a conference call with analysts and investors to discuss the Company's operations and earnings release.  During the conference call, defendants were specifically asked by a securities analyst to "talk about any changes you're seeing in the competitive environment."  In response, Bezdek falsely and misleadingly stated, in pertinent part: "*[W]hat we've seen is we have not seen sort of any competitors that have really impacted our business in any way sort of historically or currently*."  Bezdek's November 12, 2020 statement was false and misleading because defendants knew, but failed to disclose, that Amazon was developing and would soon begin introducing PrimeRx, a prescription drug discount program that would directly compete with GoodRx by offering Amazon's millions of Amazon Prime members the same discount

- 27 -

4851-0300-4145.v1

on prescription drugs at thousands of pharmacies nationwide as GoodRx. Defendants also knew, but failed to disclose, that Amazon was partnering with Inside Rx to provide the prescription drug discounts which would allow PrimeRx to offer prices that were competitive with GoodRx.

104. On November 17, 2020, Amazon publicly announced its competing PrimeRx service. In response to this news, the price of GoodRx's stock dropped from $46.72 per share at the close of trading on November 16, 2020, to $36.21 per share at the close of trading on November 17, 2020, a drop of $10.51, or 23%, on a trading volume of over 23 million shares, the highest trading volume since the Company's IPO.

105. Analysts following GoodRx also responded negatively to the news that Amazon was entering the drug discount card market and now competing with GoodRx. For example, J.P. Morgan analysts downgraded GoodRx shares to underweight with a $29 price target, citing pressure from Amazon's PrimeRx plan and discount card program. Similarly, Deutsche Bank also cut its GoodRx target price from $50 to $31 and maintained a hold rating.

106. In response to Amazon's announcement of its Amazon Pharmacy and PrimeRx, defendants immediately sought to downplay the threat Amazon's entry into the market posed to GoodRx and continued to make materially misleading public statements and material omissions during the Class Period.

107. On November 18, 2020, the day after Amazon's announcement, Hirsch attended CNBC's Disruptor 50 Summit and told investors that their fear was misguided because Amazon's PrimeRx services were complimentary, not competitive to GoodRx. In response to Hirsch's statements, the price of GoodRx stock rallied, closing at $38 per share.

108. On November 18, 2020, the day following Amazon's announcement of its Amazon Prime prescription savings benefit, defendants attended an RBC Global Technology, Internet, Media and Telecommunications Conference and downplayed

- 28 -

4851-0300-4145.v1

the threat of any competition from Amazon.  During the conference call a RBC analyst asked defendants how they saw Amazon's launch as affecting GoodRx.  In response, Bezdek flat out dismissed Amazon's PrimeRx as being an actual product or service, stating:

> If you actually look at what Amazon was talking about yesterday, they're focused on being a mail order provider.  That is what Amazon does, and it's what they do best.  And a lot of folks sort of conflated this retail pharmacy discount card that they've put up there as being an actual product or service.  But really, it's mostly there to comply with contractual obligations around insurance co-pays which they need to do for mail.

109.   During the same call Bezdek stated: "I'm a little surprised at how people have been somehow translated [Amazon] into this sort of massive new player in the discount card space.  Let's be honest, other folks in, I'll call it, the health care space have tried to launch discount card programs like this and they generally failed . . . ." and "[w]hen I think of competition, I don't think of Amazon."

110.   On December 3, 2020, defendants attended a Credit Suisse Technology Conference with analysts and continued to dismiss any competition risk from Amazon's entry into the online pharmacy and drug discount card market, with Hirsch stating:

> Amazon, what they really did, if we go back to kind of what the announcement was, is that in order to comply with insurance contracts, they added a rudimentary pharmacy discount card powered by Inside Rx, which is actually, GoodRx was the launch partner of Inside Rx. Hundreds of companies have done this for years.  It wasn't a priority for them.  It was basically that in order to show a price, because remember, this is the wacky world of health care, they couldn't do it themselves because they'd be buying those insurance and government contracts we

- 29 -

4851-0300-4145.v1

talked about.  We don't expect them to promote this card.  Again, Amazon wants to send you things by mail, that's common sense.  This card can be used at retail, but it has not ever been in their plans. They did not form any partnership with any retailers.

*     *     *

To some extent, we dominate this market.  Amazon has a tiny fraction in the mail order market, and they really don't have that much scale for us. In terms of what – with the PrimeRx card, I don't – remember that this is a very complicated thing.  If Amazon was to stand up tomorrow and say, we're going to publish our own prices or we're going to somehow customize the Inside Rx prices for us, [t]hey get ever closer to that point where lawsuits begin.  And this is not a nominal thing.

111. On December 8, 2020, defendants attended a UBS Global TMT Conference with analysts and continued to downplay any competitive risk from Amazon.  During the call an analyst again asked defendants about competition from Amazon Pharmacy and PrimeRx, Hirsch stated:

[S]uffice to say that we like the fact it's Amazon.  We think it's complementary and helpful to our service that they can drop this, but I think we remain a partner of Amazon.  However, I want to emphasize that we don't think it's detrimental to our business.  We think it's actually – it's positive because it builds more awareness.

112. On December 10, 2020, defendants attended a Barclays Global Technology, Media and Telecommunications Conference with analysts and during the call defendants emphasized GoodRx's partnership with Amazon to quell any questions as to whether Amazon Pharmacy and PrimeRx posed a competitive risk to the Company.  During the call Hirsch stated:

I don't personally see that as Amazon taking over the retail pharmacy business.  And as I just said, I think mail is really, really hard.  We are

- 30 -

4851-0300-4145.v1

partners with Amazon.  I don't want – it's not a David, Goliath.  It's not a GoodRx versus Amazon thing.  They are our partners.  We talk to the PillPack guys all the time. GoodRx is actually accepted at the Amazon Pharmacy . . . .

113.   Each of defendants statements in ¶¶103, 107-112 were materially false and misleading when made because defendants knew, but failed to disclose, that Amazon was continuing to develop its PrimeRx product to directly compete with GoodRx, and, as such, Amazon continued to pose a competitive threat to GoodRx.

114.   On March 11, 2021, after market close, GoodRx reported its fourth quarter of 2020 and fiscal year 2020 financial results and defendants held an earnings conference call with investors to discuss the results.  Defendants reported revenue growth of 36% year-over-year, but gave lower than expected first quarter of 2021 revenue guidance and reported MAC trends for the quarter that caused analysts concern.  For example, on March 12, 2021, Morgan Stanley issued a report stating "[d]ampened utilization takes its toll on 4Q MAC," and "[m]onthly active consumers metric reflects the softer underlying market trends."  On the next trading day, GoodRx's stock dropped $4.54 (10%) from a close of $43.59 per share on March 11, 2021 to a close of $39.05 per share on March 12, 2021.

115.   Two months later, on May 11, 2021, more news was disclosed by Amazon about its competing PrimeRx product.  Amazon announced the addition of a new feature to its PrimeRx product that, like GoodRx, allows consumers to compare prescription prices at over 60,000 pharmacies nationwide.  In response to this news that Amazon's competitive efforts were becoming more aggressive, GoodRx's stock price dropped another $1.06 from a close of $31.45 per share on May 10, 2021 to close of $30.59 per share on May 11, 2021 and continued to drop on May 12, 2021 to close at $29.48 per share, for a two day drop of almost 8%.

116.   On May 11, 2021, *Seeking Alpha News* reported that, "[s]hares of GoodRx (NASDAQ: GDRX) are down in morning trading after Amazon . . .

- 31 -

introduced two new features with its Amazon Prime prescription benefit" and noted that, "Prime members can now search for a drug and compare the price for it at Amazon Pharmacy and more than 60,000 pharmacies nationwide that accept the discount benefit. In addition, Prime members can now find out their expected co-pay with their insurance to compare against the Amazon price for the medication."

**C.    Additional Scienter Allegations**

117.   The following additional facts, when considered collectively with those alleged elsewhere herein, support a strong inference that defendants knowingly made materially false or misleading statements and/or omissions, or acted recklessly in doing so during the Class Period.

118.   Defendants acted with scienter in that they: knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding the GoodRx's competitive landscape, their control over, and/or receipt and/or modification of GoodRx's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning GoodRx, participated in the fraudulent scheme alleged herein.

119.   The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including defendants Hirsch, Bezdek and Voermann. Given their executive level positions with GoodRx, the Individual Defendants controlled the contents of GoodRx's public statements during the Class Period. The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior

- 32 -

to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of these Individual Defendants was responsible for the accuracy of GoodRx's corporate statements and is, therefore, responsible and liable for the representations contained therein.

120. The timing of the Company's IPO is indicative of scienter. Defendants timed the IPO so that it was priced before Amazon announced its Amazon Pharmacy and PrimeRx product to create artificial demand for the common shares sold therein, as well to maximize the amount of money the Company and selling shareholders could raise in the IPO. The Company received $887 million in net proceeds from the sale of GoodRx common stock in the IPO and insiders Andrew Slutsky, the Company's Consumer President; Idea Men, LLC, an entity whose managing members included defendants Hirsch and Bezdek; and Spectrum Equity VII, L.P., an entity whose managing directors included defendant LeSieur, collectively sold $349 million of GoodRx common stock in the IPO. In total, these GoodRx insiders and certain other selling stockholders collectively reaped gross proceeds of more than ***$369 million*** from the sale of GoodRx common stock in the IPO.

121. Moreover, defendants were aware that Amazon's entry into the prescription drug discount business was imminent because Amazon and GoodRx had a close business partnership for at least two years prior to the IPO and communicated frequently. As defendants admitted during investor conference calls following Amazon's announcement, defendants communicated regularly with Amazon through this partnership. For example, during a December 3, 2020 investor conference call, Hirsch confirmed GoodRx's pre-IPO partnership with Amazon, stating: "I'm very happy to be partnered with Amazon. We communicate with them regularly."

- 33 -

4851-0300-4145.v1

Additionally, on a December 3, 2020 investor conference call, Hirsch admitted that since 2018 GoodRx had partnered with Amazon in providing customers of PillPack with GoodRx discounts and acknowledged that "we're both personal and professional friends with PillPack."

122.   Moreover, the Registration Statement highlighted the Company's close cooperation with Amazon and the purported benefits provided to GoodRx's business and platform as a result of this close relationship, which further supports a strong inference of scienter.  For example, the Registration Statement represented: "We leverage major third-party cloud and data service providers, such as Amazon Web Services" and claimed that GoodRx had "built a modular system of services on top of this infrastructure" that was "cloud native, scalable and reliable."  The Registration continued, in pertinent part:

> ***We rely on software-as-a-service, or SaaS, technologies from third parties***.
>
> We rely on SaaS technologies from third parties in order to operate critical functions of our business, including financial management services, relationship management services, marketing services and data storage services. For example, we rely on Amazon Web Services for a substantial portion of our computing and storage capacity . . . .  Amazon Web Services provides us with computing and storage capacity pursuant to an agreement that continues until terminated by either party.

123.   Furthermore, when Amazon announced its entry into the prescription discount card market through its PrimeRx program it also announced that the program would be administered by Inside Rx, a subsidiary of Express Scripts, both of whom were close business partners with GoodRx.  In May 2017 GoodRx partnered with Express Scripts and other cross-industry partners, to launch Inside Rx.  As a launch partner in Inside Rx, GoodRx provided a technology platform used to facilitate direct

- 34 -

access for consumers to lower prices for more than 209 brand-name prescription drugs. In fact, after Amazon disclosed its entry into the prescription discount card market, defendants repeatedly touted GoodRx's close partnership with Inside Rx and the fact that it was one of the launch partners of Inside Rx. Additionally, in the first half of 2020, Express Scripts was a material revenue source for GoodRx in that it accounted for more than 10% of the Company's revenue. Given GoodRx's business partnership with both Express Scripts and Inside Rx, it is highly probable that the Company would have been privy to information about Inside Rx's administration of Amazon's PrimeRx program before Amazon publicly announced the program's launch. Thus, GoodRx's close connections to and cooperation with Amazon, both directly and through Inside Rx, further confirm defendants acted with scienter in making the materially false and misleading statements identified herein.

124. Moreover, GoodRx's prescription drug discount business represented the Company's core operation and was essential to the Company's continued financial viability as it represented more than 90% of the Company's revenue at the time of the IPO.

125. Defendants' scienter is further supported by the fact that just before the IPO, GoodRx began embarking upon a series of acquisitions to boost revenues and stave off the risk of competition from Amazon's entry into the market. In the Company's amended registration statement filed September 14, 2020, GoodRx reported that Scriptcycle "specializes in managing prescription programs and primarily partners with regional retail pharmacy chains to provide discount offerings," and accordingly, the acquisition "helps us expand our business capabilities, particularly in respect of our prescription offering." Similarly, in March 2021, the Company acquired HealthiNation to supplement and expand the services currently available under the Company's existing pharmaceutical manufacturer solutions platform. And on April 30, 2021, the Company acquired RxSaver, a direct competitor

- 35 -

of GoodRx, which operated a price comparison platform to provide discount offerings through partnerships with PBMs.

126. Given defendants' knowledge of Amazon's intention to enter the online pharmaceutical business and their misleading statements about GoodRx's competitive position made contemporaneously with that knowledge, defendants' materially false and/or misleading statements alleged herein were made willfully and caused GoodRx common stock to trade at artificially inflated prices during the Class Period.

**D.    Loss Causation**

127. As detailed herein, during the Class Period, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of GoodRx common stock. This scheme operated as a fraud or deceit on Class Period purchasers of GoodRx common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of GoodRx common stock declined significantly as the prior artificial inflation came out of the price of GoodRx common stock.

128. By concealing from investors the adverse facts detailed herein, defendants presented a misleading picture of GoodRx's business, prospects and operations. Defendants' false and misleading statements had the intended effect and caused GoodRx common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $64.22 per share on September 29, 2020. Following the adverse revelations detailed herein in ¶¶104-105, 114-116, the price GoodRx common stock fell to a low of $28.48 per share on May 12, 2021. As a result of their purchases of GoodRx common stock at artificially inflated prices during the Class Period, plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

129. When the truth about the Company was revealed to the market, the price of GoodRx common stock fell significantly. The decline removed the inflation from

- 36 -

the price of GoodRx common stock, causing real economic loss to investors who had purchased GoodRx common stock during the Class Period. The decline in the price of GoodRx common stock when the corrective disclosure came to light was a direct result of the nature and extent of defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price decline in GoodRx common stock negate any inference that the loss suffered by plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to defendants' fraudulent conduct.

130. The economic loss, *i.e.*, damages, suffered by plaintiffs and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of GoodRx common stock and the subsequent significant decline in the value of GoodRx common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

**E.    Applicability of Presumption of Reliance: Fraud on the Market Doctrine**

131. At all relevant times, the market for GoodRx common stock was an efficient market for the following reasons, among others:

(a)    GoodRx common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient, national stock market;

(b)    as a regulated issuer, GoodRx filed periodic public reports with the SEC and the NASDAQ;

(c)    GoodRx regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

4851-0300-4145.v1

(d)    GoodRx was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

132.    As a result of the foregoing, the market for GoodRx common stock promptly digested current information regarding GoodRx from all publicly available sources and reflected such information in the price of GoodRx common stock.  Under these circumstances, all purchasers of GoodRx common stock during the Class Period suffered similar injury through their purchase of GoodRx common stock at artificially inflated prices and a presumption of reliance applies.

**F.    No Safe Harbor**

133.    The statutory safe harbor provided for forward-looking statements under the Private Securities Litigation Reform Act of 1995 does not apply to any of the allegedly false statements plead in this complaint.  Pursuant to 15 U.S.C. §78u-5(b)(2)(D), the false and misleading statements alleged to have been made in the Registration Statement are not protected by the statutory safe harbor.  Additionally, the false and misleading statements alleged in ¶¶103, 107-112 all relate to then-existing facts and conditions.  In addition, to the extent certain of these statements alleged to be false may be characterized as forward looking, they were not adequately identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Furthermore, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement

- 38 -

4851-0300-4145.v1

was authorized or approved by an executive officer of GoodRx who knew that the statement was false when made.

**G.     Causes of Action**

## COUNT III

**For Violation of §10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder Against Defendants
GoodRx, Hirsch, Bezdek and Voermann**

134.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

135.   During the Class Period, defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

136.   Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business that operated as a fraud and deceit upon the purchasers of the Company common stock during the Class Period.

137.   Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for GoodRx common stock.  Plaintiffs and the Class would not have purchased GoodRx common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

138.   As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of GoodRx common stock during the Class Period.

- 39 -

4851-0300-4145.v1

## COUNT IV

### For Violation of §20(a) of the Exchange Act
### Against Defendants Hirsch, Bezdek and Voermann

139.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

140.   The Individual Defendants acted as controlling persons of GoodRx within the meaning of §20(a) of the Exchange Act.

141.   Defendants Hirsch and Bezdek, via their affiliation with Idea Men, LLC, were among the largest beneficial owners of GoodRx common stock prior to the IPO.

142.   By virtue of their positions as officers and/or directors of GoodRx, and/or their beneficial ownership of GoodRx common stock, the Individual Defendants had the power and authority to, and did, cause GoodRx to engage in the wrongful conduct alleged.

143.   As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of GoodRx common stock during the Class Period.

144.   By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.   Designating plaintiffs as Lead Plaintiffs and declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and plaintiffs' counsel as Lead Counsel;

B.   Awarding plaintiffs and other members of the Class damages together with interest thereon;

C.   Awarding plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, expert fees and other costs and disbursements; and

- 40 -

4851-0300-4145.v1

D.     Awarding plaintiffs and other members of the Class such other and further relief as the Court deems just and proper under the circumstances.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  June 7, 2021

ROBBINS GELLER RUDMAN
  & DOWD LLP
LAURIE L. LARGENT
DANIELLE S. MYERS
JENNIFER N. CARINGAL


                           s/ LAURIE L. LARGENT
                        LAURIE L. LARGENT

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
llargent@rgrdlaw.com
dmyers@rgrdlaw.com
jcaringal@rgrdlaw.com

Lead Counsel for Lead Plaintiff
Janice L. Kasbaum

JOHNSON FISTEL, LLP
FRANK J. JOHNSON
655 West Broadway, Suite 1400
San Diego, CA  92101
Telephone:  619/230-0063
619/255-1856 (fax)
frankj@johnsonfistel.com

Additional Counsel for Lead Plaintiff
Janice L. Kasbaum

POMERANTZ LLP
JEREMY LIEBERMAN
J. ALEXANDER HOOD II (admitted *pro hac vice*)
CARA DAVID (admitted *pro hac vice*)
600 Third Avenue
New York, NY  10016
Telephone:  212/661-1100
212/661-8665 (fax)
jalieberman@pomlaw.com
ahood@pomlaw.com
cdavid@pomlaw.com

- 41 -

4851-0300-4145.v1

POMERANTZ LLP
JENNIFER PAFITI
1100 Glendon Avenue, 5th Floor
Los Angeles, CA 90024
Telephone: 310/432-8492
jpafiti@pomlaw.com

Lead Counsel for Lead Plaintiffs
Betty Kalmanson, Lawrence Kalmanson,
and Shawn Kalmanson

BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC
PERETZ BRONSTEIN
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: 212/697-6484
212/697-7296 (fax)
peretz@bgandg.com

Additional Counsel for Lead Plaintiffs
Betty Kalmanson, Lawrence Kalmanson,
and Shawn Kalmanson

- 42 -

4851-0300-4145.v1