ROBBINS GELLER RUDMAN
& DOWD LLP
LAURIE L. LARGENT (153493)
DANIELLE S. MYERS (259916)
JENNIFER N. CARINGAL (286197)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
llargent@rgrdlaw.com
dmyers@rgrdlaw.com
jcaringal@rgrdlaw.com

Lead Counsel for Lead Plaintiff
Janice L. Kasbaum

POMERANTZ LLP
JENNIFER PAFITI (282790)
CARA DAVID (admitted pro hac vice)
600 Third Avenue
New York, NY 10016
Telephone: 212/661-1100
212/661-8665 (fax)
jpafiti@pomlaw.com
cdavid@pomlaw.com

Lead Counsel for Lead Plaintiffs
Betty Kalmanson, Lawrence Kalmanson,
and Shawn Kalmanson

[Additional counsel appear on signature page.]

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| IN RE GOODRX HOLDINGS, INC. SECURITIES LITIGATION | Master File No. 2:20-cv-11444-DOC-PD |
| | **PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| This Document Relates To: | |
| ALL ACTIONS | Date: December 6, 2021 |
| | Time: 8:30 a.m. |
| | Courtroom: 9D |
| | Judge: Hon. David O. Carter |

# **TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ............................................................................1

II.   STATEMENT OF FACTS ..................................................................................3

    A.   Background of GoodRx's Business ..........................................................3

    B.   GoodRx's Material Relationships with InsideRx, Express Scripts, and Amazon ...........................................................................................4

    C.   The IPO ...................................................................................................4

    D.   The Truth Emerges.................................................................................5

III.  LEGAL STANDARD ........................................................................................6

IV.   ARGUMENT .....................................................................................................8

    A.   Plaintiffs' Section 11 Claims Should be Sustained ................................8

    B.   Plaintiffs' Plead Falsity as to the Alleged Misrepresentations ...............9

        1.   GoodRx's Statements In the Registration Statement Were False and Misleading ................................................................9

        2.   GoodRx's Statements Are Not Non-Actionable Opinions.........15

        3.   The Complaint Adequately Pleads False Statements Post-IPO..................................................................................16

        4.   The Complaint Adequately Pleads that Defendants Violated Items 303 and 105 of Regulation S-K .......................................17

    C.   The Complaint Raises a Strong Inference of Scienter..........................18

        1.   The Importance of GoodRx's Prescription Drug Discount Program and Defendants Access to Information Support a Strong Inference of Scienter ......................................................19

        2.   GoodRx's Material Relationships With InsideRx, Express Scripts Amazon Support a Strong Inference of Sceinter............21

        3.   The Timing of the Company's IPO Supports a Strong Inference of Scienter................................................................23

    D.   The Individual Defendants are Liable as Control Persons ...................25

V.    CONCLUSION .................................................................................................25

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) .................................................................................................11

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ................................................................................9, 10

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
   2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ...........................................................10

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002) ...................................................................................10

*Cai v. Switch, Inc.*,
   2019 WL 3065591 (D. Nev. July 12, 2019) ..............................................................17

*Derr v. RA Med. Sys., Inc.*,
   2021 WL 1117309 (S.D. Cal. Mar. 24, 2021) ...........................................................10

*Doyun Kim v. Advanced Micro Devices, Inc.*,
   2019 WL 2232545 (N.D. Cal. May 23, 2019) ...........................................................14

*EB Inv. Mgmt. AB v. Align Tech., Inc.*,
   485 F. Supp. 3d 1113 (N.D. Cal. 2020)....................................................................20

*ESG Cap. Partners, LP v. Stratos*,
   828 F.3d 1023 (9th Cir. 2016) .................................................................................19

*Fecht v. Price Co.*,
   70 F.3d 1078 (9th Cir. 1995) ...................................................................................23

*Flynn v. Sientra, Inc.*,
   2016 WL 3360676 (C.D. Cal. June 9, 2016)........................................................14, 19

*Gammel v. Hewlett-Packard Co.*,
   2013 WL 1947525 (C.D. Cal. May 8, 2013)..............................................................15

*Herman & MacLean v. Huddleston*,
459 U.S . 375 (1983) .................................................................................................... 8

*Hildes v. Arthur Andersen LLP*,
734 F.3d 854 (9th Cir. 2013) ....................................................................................... 7

*In re Alphabet, Inc. Sec. Litig.*
1 F.4th 687 (9th Cir. 2021) ........................................................................................ 22

*In re Am. Apparel, Inc. S'holder Litig.*,
855 F. Supp. 2d 1043 (C.D. Cal. 2012) ..................................................................... 10

*In re Apple Inc. Sec. Litig.*,
2020 WL 2857397 (N.D. Cal. June 2, 2020) ............................................................. 10

*In re Bare Escentuals Inc. Sec. Litig.*,
745 F. Supp. 2d 1052 (N.D. Cal. 2010) ....................................................................... 1

*In re Daou Sys. Inc.*,
411 F.3d 1006 (9th Cir. 2005) ................................................................................... 24

*In re Eventbrite, Inc. Sec. Litig.*,
2020 WL 2042078 (N.D. Cal. Apr. 28, 2020) ........................................................... 13

*In re Facebook, Inc. Sec. Litig.*,
477 F. Supp. 3d 980 (N.D. Cal. 2020) ....................................................................... 14

*In re Imperial Credit Indus. Sec. Litig.*,
2000 WL 1049320 (C.D. Cal., Feb. 22, 2000) .......................................................... 23

*In re Intuitive Surgical Sec. Litig.*,
65 F. Supp. 3d 821 (N.D. Cal. 2014) ........................................................................... 9

*In re KeySpan Corp. Sec. Litig.*,
2003 WL 21981806 (E.D.N.Y. July 30, 2003) .......................................................... 12

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ............................................................................... 9, 17

*In re Pivotal Sec. Litig.*,
2020 WL 4193384 (N.D. Cal. July 21, 2020) ........................................................... 14

*In re Quality Sys.*,
865 F.3d 1130 (9th Cir. 2017) ................................................................................... 12

iii

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007) ......................................................7

*In re Snap Inc. Sec. Litig.*,
  2018 WL 2972528 (C.D. Cal. June 7, 2018)...........................................7, 8

*In re Stac Electronics Securities Litigation*,
  89 F.3d 1399 (9th Cir.1996), *cert. denied,* 520 U.S. 1103, 117 S.Ct.
  1105, 137 L.Ed.2d 308 (1997)................................................................11

*In re Stratosphere Corp. Sec. Litig.*,
  1 F. Supp. 2d 1096 (D. Nev. 1998) ........................................................15

*In re Take-Two Interactive Sec. Litig.*,
  551 F.Supp.2d 247 (S.D.N.Y. 2008) .......................................................24

*In re Vantive Corp. Sec. Litig.*,
  283 F.3d 1079 (9th Cir. 2002) ...............................................................25

*In re Worlds of Wonder Sec. Litig.*,
  35 F.3d 1407 (9th Cir. 1994) ...................................................................8

*In re YayYo, Inc. Sec. Litig.*,
  2021 WL 2766894 (C.D. Cal. July 2, 2021) .............................................7

*Kendall v. Odonate Therapeutics, Inc.*,
  2021 WL 3406271 (S.D. Cal. Aug. 4, 2021)............................................25

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ...................................................................8

*Knollenberg v. Harmonic, Inc.*,
  152 Fed. Appx. 674 (9th Cir. 2005) .........................................................7

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  437 F.3d 588 (7th Cir. 2006), *rev'd on other grounds by Makor
  Issues & Rights, Ltd. v. Tellabs, Inc.*, 551 U.S. 308 (2007)................12

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ..................................................................................6

*Mulligan v. Impax Lab'ys, Inc.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014)......................................................12

iv

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) ........................................................................20, 21

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W.
    Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ........................................................................7, 25

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ............................................................................24

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015). (Motion .) ...................................................................15, 16

*Pirani v Slack Tech., Inc.*,
    445 F. Supp. 3d 367 (N.D. Cal 2020), *motion to certify appeal
    granted*, 2020 WL 7061035 (N.D. Cal. June 5, 2020), *aff'd*, 2021
    WL 4258835 (9th Cir. Sept. 20, 2021) ......................................................8, 14, 18

*Rubke v. Capitol Bancorp, Ltd.*,
    551 F.3d 1156 (9th Cir.2009) ..............................................................................7

*S. Ferry LP v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ..............................................................................18

*S.E.C. v. Talbot*,
    530 F.3d 1085 (9th Cir. 2008) ............................................................................11

*SEC v. Todd*,
    642 F.3d 1207 (9th Cir. 2011) .......................................................................7, 18

*Shankar v. Imperva, Inc.*,
    2016 WL 2851859 (N.D. Cal. May 16, 2016) ....................................................20

*Steckman v. Hart Brewing*,
    143 F.3d 1293 (9th Cir. 1998) ............................................................................17

*Steinberg v. PRT Grp., Inc.*,
    88 F. Supp. 2d 294 (S.D.N.Y. 2000) (Motion ) ..................................................11

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ..............................................................................6, 18, 24

*Washtenaw Cty. Emps. Ret. Sys. v. Celera Corp.*,
    2012 WL 3835078 (N.D. Cal. Sept. 4, 2012).....................................................10

v

*Weller v. Scout Analytics, Inc.*,
   230 F. Supp. 3d 1085 (N.D. Cal. 2017)...............................................................13

**Statutes**

15 U.S.C. §77k..............................................................................................*passim*

15 U.S.C. §77o.............................................................................................2, 7, 18, 25

15 U.S.C. §78j(b)................................................................................................2, 7, 8

15 U.S.C. §78t(a) ...........................................................................................*passim*

15 U.S.C. §78u-4(b)(2) ........................................................................................9, 18

PSLRA .............................................................................................................16, 19

**Rules**

17 C.R.F §240.10b-5 .................................................................................................2

Fed R. Civ. P. 8........................................................................................................7

Fed. R. Civ. P. 9(b) ..............................................................................................7, 8

**Other Authorities**

17 C.F.R. § 229.105 ................................................................................................18

17 C.F.R. § 229.303(a)(3)(ii)...............................................................................17, 18

Lead Plaintiffs Betty Kalmanson, Lawrence Kalmanson, Shawn Kalmanson, and Janice L. Kasbaum, (collectively, "Plaintiffs") submit this memorandum of law in support of their opposition to the motions to dismiss the Consolidated Class Action Complaint (the "Complaint") filed by the GoodRx Defendants[1] (ECF No. 86, the "Motion") and the Underwriter Defendants (ECF No. 89, the "Underwriter Motion").[2]

## I. PRELIMINARY STATEMENT

For a while GoodRX had it made – it was THE source for discount codes on prescription pharmaceuticals. But, before GoodRx went public in September 2020, its "friend" Amazon was making plans to enter into its market. And Defendants knew.

Plaintiffs sufficiently allege Defendants were well aware that tech giant Amazon was preparing to launch its own discount prescription drug program shortly after GoodRx's IPO. GoodRx was a founding partner of Inside Rx, with whom Amazon was partnering to enter into the market. Moreover, at the time of the IPO, GoodRx had maintained a long-standing relationship with Amazon's subsidiary, PillPack. Defendants even bragged to investors about their close ties with Amazon. At the time of the GoodRx IPO, Defendants knew what the public did not – that with Amazon's imminent entry into the market with PrimeRx, GoodRx was facing a material competitive risk.

---

[1] The GoodRx Defendants are GoodRx Holdings, Inc. ("GoodRx" or the "Company"), Douglas Hirsch, Trevor Bezdek, Karsten Voermann, Christopher Adams, Julie Bradley, Dipanjan Deb, Adam Karol, Jacqueline Kosecoff, Stephen LeSieur, Gregory Mondre and Agnes Rey-Giraud. The Underwriter Defendants are Morgan Stanley & Co. LLC, Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Barclays Capital Inc., BofA Securities Inc., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, RBC Capital Markets, LLC, UBS Securities LLC, Cowen and Company, LLC, Deutsche Bank Securities Inc., Evercore Group L.L.C., Citizens Capital Markets, Inc., KKR Capital Markets LLC, LionTree Advisors LLC, Raymond James & Associates, Inc., SVB Leerink LLC, Academy Securities, Inc., Loop Capital Markets LLC, R. Seelaus & Co., LLC and Samuel A. Ramirez & Company, Inc. (collectively the "Underwriters").

[2] Plaintiffs do not contest GoodRx's Request for Judicial Notice. *See* ECF No. 88. The Court may not, however, "consider these documents for the truth of the matters asserted therein." *In re Bare Escentuals Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1067 (N.D. Cal. 2010).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS    CASE NO.: 2:20-cv-11444-DOC-PD

Rather than acknowledge to investors the competitive threat Amazon's entry into the prescription drug market posed, Defendants misleadingly touted GoodRx's competitive advantage and the strong relationships the Company had with its Pharmacy Benefit Managers ("PBMs"). What is more, the Company pushed to complete its IPO prior to Amazon's announcement in order to bolster Defendants' proceeds, raising $1 billion from public investors, with $349 million going to GoodRx insiders.

Plaintiffs are pursuing remedies under §§11 and 15 of the Securities Act of 1933 (15 U.S.C. §§77k and 77o) (the "Securities Act"), and §§10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§78j(b) and 78t(a)) (the "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5) in light of Defendants' many misrepresentations, which served to benefit GoodRx and its insiders at the expense of investors.

Defendants know they have no argument on traceability for the Securities Act claims or reliance and loss causation for the Exchange Act Claims, and therefore focus on one faulty theme: that no statement Defendants made was technically false (which is not the relevant inquiry) and the Complaint does not allege sufficient facts regarding Defendants' knowledge (which is false). But, to the contrary, the Complaint sufficiently pleads that each of the alleged misrepresentations was misleading based on what Defendants knew at the time they made those statements. When considered collectively, the Complaint's allegations sufficiently establish Defendants' knowledge and scienter. GoodRx's prescription drug discount program – the very same program Amazon's entry into the market would threaten – represented over 90% of the Company's revenue. It was frequently discussed (including with Amazon) and scrutinized by Company executives. The related allegations as detailed in the Complaint and below, are sufficient to survive a motion to dismiss.

For these reasons, and the additional reasons set forth herein, the motions should be denied in their entirety.

## II.    STATEMENT OF FACTS

### A.    Background of GoodRx's Business

GoodRx has been in business since 2011 and is based in Santa Monica, California. ¶2-3.[3] The Company's core business is a healthcare technology platform that provides consumers with current prescription drug prices and discounts to help them find the lowest cost pharmacy for their prescriptions. ¶2. According to the Company's website, consumers can use GoodRx's platform to save up to 80% on most prescription drugs at over 70,000 U.S. pharmacies. ¶38. While the Company also generates revenue from subscription, advertising and telehealth services, at the time of the IPO, GoodRx generated over 90% of its revenues from its prescription drug discount program. *Id.*

GoodRx contracts with PBMs, who provide GoodRx with the negotiated drug discounts it provides to consumers. ¶2. The categories and brands of medication, as well as the pricing, that GoodRx publishes for consumers are determined by the Company's contracted PBMs. ¶39. Once the consumer finds the best prescription drug price on GoodRx's website or mobile app, a coupon is generated, similar to ones used at a grocery store, for the consumer to use at the participating pharmacy. ¶2. GoodRx's prescription drug program is free to consumers; in essence, GoodRx makes its money by selling its technology platform to PBMs. *Id.* For example, under a percentage of the fee arrangement, when a consumer uses the GoodRx code to fill a prescription, the pharmacy pays the PBM whose pricing is used, with a majority of that fee shared with GoodRx. ¶39. Thus, the more volume that goes through the GoodRx technology platform, the more revenue the Company generates. *Id.*

---

[3] Paragraphs in the Complaint are cited as "¶__."

3

**B. GoodRx's Material Relationships with InsideRx, Express Scripts, and Amazon**

Because GoodRx's revenues are almost exclusively dependent on its PBMs, the Company maintains close relationships with those partners and purportedly protects and monitors its interests through contract provisions that prevent the PBMs from redirecting volumes outside of GoodRx's technology platform. ¶4. In the first half of 2020, Express Scripts, one of GoodRx's largest PBMs, accounted for more than 10% of GoodRx's revenue. ¶40. In May 2017, GoodRx also entered into partnership with Express Scripts, and other cross-industry partners, to launch InsideRx, a pharmacy savings program that offers certain brand name medications at discount prices. ¶¶50, 123. InsideRx utilizes GoodRx's technology platform to facilitate its saving program. ¶123. As discussed below, it was through InsideRx that Amazon was able to offer its PrimeRx program, which launched just weeks after GoodRx's IPO.

In addition to GoodRx's direct participation in InsideRx, the Company also had a material relationship with Amazon through PillPack, an online pharmacy acquired by Amazon in 2018. ¶51. At the time of the IPO, GoodRx had been in an ongoing two-year partnership with PillPack. *Id.* Defendant Hirsch even asserted during an investor call that GoodRx was both "***personal and professional friends***" with PillPack. ¶121. GoodRX also relied "on Amazon Web Services for a substantial portion of [its] computing and storage capacity." ¶122.

**C. The IPO**

On August 28, 2020, GoodRx issued a press release announcing that the Company was launching an IPO. ¶3. On September 22, 2020, GoodRx announced the pricing of its IPO of 34.6 million shares of its Class A common stock at an initial public offering price of $33 per share. ¶43. The Company announced that of the shares offered, 23.4 million were being offered by the Company and 11.2 million shares were being offered by certain of GoodRx's insiders and selling shareholders. *Id.* On September 23, 2020, GoodRx and the Underwriters conducted the IPO, ultimately

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS    CASE NO.: 2:20-cv-11444-DOC-PD

selling 39.8 million shares of GoodRx Class A common stock to the investing public. ¶44. The IPO, priced at $33 per share, raised more than $1 billion in gross proceeds from public investors, $349 million of which went to GoodRx insiders. ¶3. On September 25, 2020, GoodRx closed the IPO, one of the largest IPOs in 2020. ¶45.

But those who purchased shares did not know something Defendants did – Amazon, with the help of InsiderRx, was entering the prescription drug discount market. Instead of telling investors the truth about Amazon's imminent competition, the Registration Statement repeatedly touted the Company's competitive advantage to investors. For example, the Registration Statement included statements such as, "[o]ur partnerships across the healthcare ecosystem, scale and strong consumer brand create a deep competitive moat that is reinforced by our proprietary technology platform," (¶57); "[w]e are a market leader with a significant scale and brand advantage over our competitors. Our growth accelerates self-reinforcing network effects that further strengthen our competitive position." (¶58); that the Company had competitive strengths such as a "Leading Platform," a "Trusted Brand," a "Scaled and Growing Network," "Consumer-focus," an "Extensible Platform," and a "Cash Generative Monetization Model" (¶59); "[t]he size of our database, combined with our proprietary platform, allows us to present highly competitive prices to consumers." (¶61); "[f]or many of our PBM partners, we are their only significant direct-to-consumer channel. To date, we have retained all of our PBM partners, which highlights the strength of our relationships alongside the value we deliver" (¶62); and "[w]e believe our financial results reflect the significant market demand for our offerings and the value that we provide to the broader healthcare ecosystem" (¶64).

### D.     The Truth Emerges

Once GoodRx went public, Defendants continued to stress the Company's position as the leader in the prescription drug discount market. For example, on a November 12, 2020 conference call with investors and analysts, Defendant Bezdek

5

stated: "what we've seen is we have not seen sort of any competitors that have really impacted our business in any way sort of historically or currently." ¶103.

But on November 17, 2020, just weeks after GoodRx conducted the IPO, Amazon revealed to the market what Defendants already knew – Amazon was launching PrimeRx, a prescription drug discount program almost identical to GoodRx, that would make it "simple for customers to compare prices and purchase medications for home delivery, all in one place." ¶67. That same day, CNBC.com reported that Amazon Prime members would have discounts of up to 80% on generic medications and up to 40% on brand-name prescriptions through Amazon's relationship with the Inside Rx savings program. ¶68. On this news, the price of GoodRx stock declined 23%, from $46.72 per share to $36.21 per share by market close on November 17, 2020, on extremely heavy trading volume of over 23 million shares traded. ¶69. But GoodRx kept assuring the market that Amazon was not a competitive threat. ¶¶103-112.

Then, on May 11, 2021, Amazon announced the addition of a new feature to PrimeRx that would allow consumers to compare prescriptions at over 60,000 pharmacies nationwide. ¶71. On this news, GoodRx's stock price dropped another $1.06 from a close of $31.45 per share on May 10, 2021 to close of $30.59 per share on May 11, 2021, and continued to drop on May 12, 2021 to close at $29.48 per share, for a two day drop of almost 8%. *Id.*

## III.    LEGAL STANDARD

Plaintiffs "need only allege enough facts to state a claim to relief that is plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.8 (2011). Courts must accept as true all well-pled factual allegations, draw all reasonable inferences in plaintiff's favor, and determine whether the plaintiff may be entitled to relief under any reasonable reading of the complaint. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007).

"Section 11 places a relatively minimal burden on a plaintiff." *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013) (citing *Herman & MacLean v. Huddleston*, 459 U.S . 375, 382 (1983)). Liability under Section 11 requires that only "any part of the registration statement . . . contain[] an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Issuers can therefore be liable for what the registration says as well as what it leaves out. *See In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *8 (C.D. Cal. June 7, 2018) (Wilson, J.). No proof of scienter, reliance, or loss causation is required. *See Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156, 1161 (9th Cir.2009).[4]

Plaintiffs' Securities Act claims do not necessarily "sound in fraud" and are, therefore, generally subject to the permissive notice pleading standards of Rule 8(a). *See Knollenberg v. Harmonic, Inc.*, 152 Fed. Appx. 674, 683-684 (9th Cir. 2005) (finding that Rule 9(b) did not apply where "[C]laims [were] not 'grounded in fraud' because Plaintiffs allege[d] a basis for Section 11 liability other than fraud; i.e., the omission of a material fact from the Registration Statement."); *see also In re Refco, Inc. Sec. Litig.,* 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) (finding careful division of Section 11 and Section 10(b) claims, such as the one present in the instant complaint, instructive).[5] Fed R. Civ. P. 8 requires a "short and plain statement of the claim showing that the pleader is entitled to relief."

To state a claim under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)),

---

[4] To state a claim under the control-person liability provision of the Securities Act, a plaintiff must show that (1) there is a primary violation of the Securities Act and (2) the defendant directly or indirectly controlled the person or entity liable for the primary violation. *See SEC v. Todd,* 642 F.3d 1207, 1223 (9th Cir. 2011). The standard for 20(a) is similar. *See No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 946 (9th Cir. 2003).

[5] Additionally, even if this Court finds Rule 9(b) applies to Plaintiffs' pleading with regard to those Defendants who are named in both Securities and Exchange Act claims, it does not apply to the Underwriter Defendants, who have solely Securities Act claims levied against them. *See, e.g., In re YayYo, Inc. Sec. Litig.*, 2021 WL 2766894, at *1, n.1 (C.D. Cal. July 2, 2021).

7

plaintiffs must plead: "(1) a material misstatement or omission…; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance…; (5) economic loss; and (6) loss causation." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 n.36 (9th Cir. 2018). Plaintiffs' claims under the Exchange Act must meet the heightened pleading standard of Rule 9(b).

## IV.    ARGUMENT

### A.    Plaintiffs' Section 11 Claims Should be Sustained

Contrary to what Defendants assert (Motion at 8-10), Plaintiffs have alleged a sufficient claim under Section 11. "Damages are not an element of a Section 11 claim." *Pirani v Slack Tech., Inc.*, 445 F. Supp. 3d 367, 382 (N.D. Cal 2020), *aff'd*, 2021 WL 4258835 (9th Cir. Sept. 20, 2021); *see also In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1168 n.40 (C.D. Cal. 2008) (citing *Herman & MacLean & Huddleston*, 459 U.S. 375, 382 (1983) (same). "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case." *Huddleston*, at 382. Any argument regarding damages involving a Section 11 claim is an affirmative defense that places a "heavy burden" of proof on the defense. *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1421-22 (9th Cir. 1994) ("The defendant has the burden of proof on this defense.").

Even though Plaintiffs need not allege damages at the pleading stage, Plaintiffs have adequately alleged damages in the Complaint. The fact that the GoodRx share price did not fall below the IPO offering price until after the filing of the first Complaint is of no matter: stockholders "suffered a decline in the value—the true price—of their securities." *In re Snap*, 2018 WL 2972528, at *9. Value-based Section 11 damages can be proven if Plaintiffs can show that the stock's price at the time of the IPO would have been lower if not for the omissions and misrepresentations – but that proof need not come at the pleading stage. Here, the GoodRx "stock price at IPO

8

[did] not reflect the true value of the security." *See id.* at 22 n.24. Plaintiffs plead this specifically. *See* ¶56 (On the two trading days after another Amazon revelation on May 11, 2021, GoodRx's stock price dropped almost 8% "to a price below the $33 per share IPO price, showing that GoodRx's IPO price did not accurately represent its actual value."). Defendants ignore this pleading and argue that "any stock price decline after the filing of the initial complaint is not recoverable under Section 11" (Motion at 9), but, while not directly recoverable, the later drop is circumstantial evidence of the true value of GoodRX shares at the time of the IPO.

### B.    Plaintiffs' Plead Falsity as to the Alleged Misrepresentations

A complaint adequately alleges falsity by "specify[ing] each statement alleged to have been misleading" and the "reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). A statement is false or misleading if it "would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). Even if the statement is not literally false, it may still be misleading if it omits material information. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014). The allegations need only "raise a plausible inference" that a statement was misleading. *See In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 834 (N.D. Cal. 2014). Here, Plaintiffs adequately plead that Defendants' statements were materially false and misleading.

### 1.    GoodRx's Statements In the Registration Statement Were False and Misleading

GoodRx went public knowing Amazon was knocking on its door, but failed to disclose the competition GoodRx would be facing from Amazon, instead touting the Company as a "market leader with a significant scale and brand advantage over [its] competitors," that had partnerships across the healthcare industry and a "deep competitive moat." ¶52. The Company reaffirmed this position throughout the Class Period on multiple investor calls and at multiple conferences. ¶¶103, 107, 109, 110,

9

111. Defendants also promoted GoodRx's high user demand, database and relationship with PBMs. ¶¶60-64. These statements are actionable.

Defendants' main argument is that no statement made in the Registration Statement was technically false. (Motion at 11, 13-14; Underwriters Motion at 3-4.) But statements are misleading where they "give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson*, 527 F.3d at 985; *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Here, Defendants may have been "careful to be technically correct," but the statements they made about GoodRx's advantages were still misleading given the impending launch of Amazon's pharmaceutical services. *See Washtenaw Cty. Emps. Ret. Sys. v. Celera Corp.*, 2012 WL 3835078, at *3 (N.D. Cal. Sept. 4, 2012); *see In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *16 (N.D. Cal. June 2, 2020) ("[CEO's] statement did not align with the information he possessed at the time and was therefore misleading."); *Derr v. RA Med. Sys., Inc.*, 2021 WL 1117309, at *6 (S.D. Cal. Mar. 24, 2021) ("Both sets of statements may have been technically true, but both would mislead a reasonable investor.").

The fact that Amazon was about to throw GoodRx off its perch existed at the time of the IPO. Simply because this fact did not become public until after the IPO does not make the allegation hindsight pleading. *See Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *8 (N.D. Cal. Aug. 7, 2020) (holding a complaint did not engage in "impermissible hindsight pleading" when "defendants' statements were misleading given the information available to them at the time the statements were made"); *see also In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1068 (C.D. Cal. 2012) ("[D]efendants cannot use the mere 'incantation of fraud-by-hindsight' to 'defeat an allegation of misrepresentations and omissions that were misleading and false at the time they were made.'").

This information should have been disclosed because a reasonable investor

10

would have considered these facts important in determining whether to buy or sell GoodRx stock. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988); *S.E.C. v. Talbot*, 530 F.3d 1085, 1097 (9th Cir. 2008).

Defendants reliance on *In re Stac Electronics Securities Litigation,* 89 F.3d 1399 (9th Cir.1996), *cert. denied,* 520 U.S. 1103, 117 S.Ct. 1105, 137 L.Ed.2d 308 (1997) (*In re Stac*), is misplaced. Defendants appear to believe that *In re Stac* stands for the proposition that no company ever needs to disclose information about another company. (Motion at 12, 14, 19; Underwriters Motion at 5, 7, 8, 10.) That is not the conclusion from the case. The complaint in *In Re Stac* alleged, in relevant part, "that Stac went public knowing, but without disclosing, that Microsoft was about to come out with a competitive product (a new version of DOS incorporating Stacker-like data compression capabilities) that would take away Stac' s market[.]" *Id.* at 1402-1403. Stac, in fact, had detailed disclosures about the risk of potential competition, including a disclosure directly about Microsoft. *Id.* at 1406 (noting that the offering materials mentioned Microsoft specifically and stated: "*There can be no assurance that Microsoft ...* will not incorporate a competitive data compression technology in their products or that such a technology will not emerge as an industry standard."). Therefore, defendants did not need to reveal more about Microsoft's plans because "another company's plans cannot be known to a certainty" and Stac had suitably revealed the risk Microsoft posed. *Id.* at 1407. The key difference between that case and the instant one is that Stac warned about competitive risk for pages in its Prospectus and mentioned Microsoft specifically. *Id.* GoodRx made no such warnings about Amazon. In fact, as detailed *supra*, GoodRx's Registration Statement essentially said it had no significant competition and contained nothing but generic risk warnings. *In re Stac* is inapplicable.[6]

---

[6] *Steinberg v. PRT Grp., Inc.*, 88 F. Supp. 2d 294, 304 (S.D.N.Y. 2000) (Motion at 12) is similarly distinguishable. In that case, plaintiffs argued that defendants omitted the company was losing ground to competitors, but the court found "the prospectus disclosed these very risks." In other words, while

11

Defendants' argument that many of the statements referenced in the Complaint are non-actionable "puffery" (Motion at 12-13) is equally meritless. Courts "exercise great caution" in finding statements to be non-actionable puffery. *See Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 966-67 (N.D. Cal. 2014); *In re Quality Sys.*, 865 F.3d 1130, 1142-44 (9th Cir. 2017) (statements not puffery because they "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]"). Context matters when making a puffery determination. *See In re KeySpan Corp. Sec. Litig.*, 2003 WL 21981806, at *17 (E.D.N.Y. July 30, 2003) (finding optimistic statements were actionable where "defendants were in possession of yet failed to disclose facts inconsistent with their public statements"). As the 7th Circuit has held, "we're still seeing that product continue to maintain its growth rate" is actionable when spoken on a specific product line. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 593 (7th Cir. 2006), *rev'd on other grounds by Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 551 U.S. 308 (2007). Here, GoodRx's statements about their "deep competitive moat" and "brand advantage over our competitors" (¶¶57-59) are misleading in context because at the time they were spoken, GoodRx knew that a competitor with an overall brand advantage over it was about to launch.[7]

With regard to Defendants' misrepresentations about its user demand, Defendants argue that the omitted facts do not relate to the substance of the

---

a company is not required to say "X company is doing Y," they are required to properly disclose the nature of the threats before it. Otherwise, the statements a company makes are misleading.

[7] The Underwriter Defendants' argument that GoodRx did not need to disclose anything about Amazon's impending entry into the market because Amazon had not yet disclosed its program is ludicrous and miscasts the Complaint's allegations. (Underwriters Motion at 5.) The Complaint alleges that Defendants violated federal securities laws by failing to disclose the material competitive risk GoodRx was facing from Amazon's entry into the market. *See, e.g.*, ¶52. When Defendants assured investors that GoodRx had a competitive advantage and portrayed the Company as a "market leader" with a "deep competitive moat," (¶52), they also had the duty to disclose the known material competitive risks the Company was facing at the time of the IPO, which included the imminent launch of Amazon's PrimeRx.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS      CASE NO.: 2:20-cv-11444-DOC-PD

misrepresentation (Motion at 14), but Defendants simply do not consider the Complaint wholistically. Good Rx's statements that there was a "significant market demand for [its] offerings" and it was the "most downloaded medical app" omitted the fact that Amazon's entry into the market risked all of that. Here, the omissions directly impact the statements made. It was highly likely that GoodRx would lose customers to Amazon, a huge brand name. The connection between the omissions and the statements are clear, making the allegations in the Complaint much stronger than the allegations in the complaints of the cases Defendants' rely on in the Motion. *See Id.* (*In re Eventbrite, Inc. Sec. Litig.*, 2020 WL 2042078, at *13 (N.D. Cal. Apr. 28, 2020) (finding falsity not pled where the alleged misrepresentations were about a company's "marketing capabilities, streamlined checkout experiences, and mobile box office capabilities" and the alleged omissions involved the Company's platform being inferior to a subsidiary's platform); *Weller v. Scout Analytics, Inc.*, 230 F. Supp. 3d 1085, 1093 (N.D. Cal. 2017) (no falsity pled when "Plaintiff's argument is premised on a misreading of the statement contained in the Press Release" which assumed "recurring revenue under management" to be synonymous with representations of Defendants' own gross revenue").[8]

Likewise, Defendants cannot hide behind their generic risk disclosure. GoodRx did not "appropriately warn[] investors of the possibility of increased competition." (Motion at 13.) GoodRx offered investors the generic statement that the Company "*may* face increased competition from those that attempt to replicate our business model or marketing tactics, such as discount websites, apps, cash back and loyalty

---

[8] Defendants' argument about the challenged misrepresentations regarding GoodRx's relationship with pharmacy benefit managers suffer from the same flaw. (Motion at 15.) The Registration Statement assured investors that GoodRx had contract provisions in place that "prevent[ed] PBMs from circumventing our platform, redirecting volumes outside of our platform and other protective measures[.]" ¶63. But Defendants neglected to disclose that Amazon would soon be able to offer the prescription drug discounts to its millions of Amazon Prime members that GoodRx was also offering, partnering with the same company that utilized GoodRx's platform, InsideRx. ¶66.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS     CASE NO.: 2:20-cv-11444-DOC-PD

programs and new comparison shopping sites from various industry participants, any of which ***could*** impact our ability to attract and retain consumers." ¶65 (emphasis added). This boilerplate warning of what "may" or "could" occur – when GoodRx knew very well it would occur – is plainly insufficient. *See, e.g.*, *Pirani*, 445 F. Supp. 3d at 386; *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at \*10–12 (C.D. Cal. June 9, 2016) (boilerplate warning is misleading where specific conditions known but concealed caused the risk to manifest or made it significantly more likely).

The risk warnings found not actionable in the cases Defendants' cite are distinguishable. (Motion at 13.) In *Doyun Kim v. Advanced Micro Devices, Inc.*, 2019 WL 2232545, \*7 (N.D. Cal. May 23, 2019), the court found significant that plaintiffs did not allege that "when Defendants filed the risk disclosures they had any contemporaneous reasons to believe" that what occurred was "remotely likely." Here, the Complaint clearly alleges GoodRx knew Amazon was launching a prescription service and GoodRx would face material competitive risk – therefore, the Complaint does much more than allege the situation was "remotely likely," it alleges it was an inevitability. Likewise in *In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1017-1018 (N.D. Cal. 2020), the court found the risk disclosures not actionable for reasons not applicable to the instant case. The Facebook court found certain risk disclosures not actionable because either (a) the statements warned of "reputation, business, or competitive harm, *not* improper access to or the disclosure of user data," when the Company was alleged to have information about disclosure of user data at the time; or (b) investors "had all of the information they needed to evaluate" the statement at issue. *Id.* at 1019. Neither of these is applicable in this case, where the Company had non-public information related directly to the risk warning – and yet failed to disclose it.[9]

---

[9] The Underwriter Defendants' reliance on *In re Pivotal Sec. Litig.*, 2020 WL 4193384 (N.D. Cal. July 21, 2020) is similarly misplaced. (Underwriters Motion at 8-9.) While Amazon had not yet hit the market, the risk had already come to fruition because Amazon's new prescription drug (relying on GoodRx's platform) service existed, even though it had not been announced publicly.

14

Finally, the short time between the IPO and Amazon's entry into the market is a further indication that Defendants' statements were false when made. Indeed, the announcement of Amazon Pharmacy came only seven weeks after the IPO. As such, it is clear that Defendants rushed to complete the IPO because they had knowledge of Amazon's imminent entry into the market. *See*, *e.g.*, *Gammel v. Hewlett-Packard Co.*, 2013 WL 1947525, *44 (C.D. Cal. May 8, 2013) (finding the temporal proximity between various of defendants' statements and a corrective disclosure, four to eleven weeks, supported plaintiffs' falsity allegations); *see also In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1112 (D. Nev. 1998) ("The shortness of time between later revealed truth and prior statements can be circumstantial evidence that the optimistic statements were false or misleading when made.")

### 2.    GoodRx's Statements Are Not Non-Actionable Opinions

Defendants argue that because two of the Defendants' statements are prefaced by "we believe," these statements are non-actionable opinions under *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015). (Motion at 16.) This argument is inapplicable to the statements in question.

*Omnicare* does not insulate Defendants from knowing misstatements. There are three prongs to the test laid out in *Omnicare,* and an opinion can be false, and therefore lead to liability, if it fulfills any of the prongs. The prongs are essentially (1) subjective disbelief; (2) objective falsity; or (3) omission of material facts. Under the third prong, an opinion can be false if "[it] omits material facts about [a defendant's] inquiry into, or knowledge concerning, a statement of opinion, and if those facts conflict with what a reasonable investor, reading the statement fairly and in context, would take from the statement itself." *Omnicare*, 575 U.S. at 176. That is just what Plaintiffs allege here.

Plaintiffs plead particularized allegations that these "opinions" were given with knowledge about Amazon's impending entry into the market. ¶¶47-54. The Company stated: "We believe our financial results reflect the significant market demand for our

offerings and the value that we provide to the broader healthcare ecosystem." ¶64. Here, the Company omitted that its role in the so-called "broader healthcare ecosystem" was about to change drastically by the entry of a larger player. *Id.*

The other statement Defendants assert is a non-actionable opinion statement is the following: "The size of our database, combined with our proprietary platform, allows us to present highly competitive prices to consumers. We believe that we currently have the largest database of PBM prices in the United States." ¶61. *First*, Defendants excerpt the "we believe" sentence without providing it in context. (Motion at 16.) *Second*, at this time the Company knew a goliath was entering the marketplace with its own database of PBM prices. GoodRx might have had the largest database that the public knew about, but the reality known to GoodRx was very different.

### 3. The Complaint Adequately Pleads False Statements Post-IPO

Defendants make multiple arguments regarding their post-IPO statements, but each one fails.

On November 12, 2020, Defendant Bezdek reiterated GoodRx's standing in the marketplace – that of one with essentially no significant competition. ¶103. Defendants assert Defendant Bezdek's misrepresentations were not false or misleading because the Amazon announcement had not yet been made (Motion at 18), but, as detailed above, GoodRx knew that competition was coming.

Defendants next argue that the alleged November 18, 2020 misrepresentation (¶107) does not meet the PSLRA pleading requirements. (Motion at 18.) However, the Complaint alleges who made the statement, the forum it was made and what the substance of it was. ¶107 ("On November 18, 2020, the day after Amazon's announcement, Hirsch attended CNBC's Disruptor 50 Summit and told investors that their fear was misguided because Amazon's PrimeRx services were complimentary, not competitive to GoodRx."). The Complaint therefore specifies the misleading statement, as required by the PSLRA, even though it does not quote that statement.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS     CASE No.: 2:20-cv-11444-DOC-PD

Then, unable to construct adequate arguments about each of the other remaining misrepresentations, Defendants argue that the remaining statements were made after Amazon's announcement and, therefore, were "about facts that were already public." (Motion at 19.) But, in fact, the full truth was not public – "defendants knew, but failed to disclose, that Amazon was continuing to develop its PrimeRx product to directly compete with GoodRx, and, as such, Amazon continued to pose a competitive threat to GoodRx." ¶113. PillPack was GoodRx's "friend" – GoodRx knew about Amazon's plan. As Defendant Hirsch stated: "It's not a GoodRx versus Amazon thing. ***They are our partners. We talk to the PillPack guys all the time.***" ¶112 (emphasis added). Defendants can surely not be alleging GoodRx had no idea what its "partner[]" – its "friend" – was doing to directly impact the GoodRx business.

### 4.   The Complaint Adequately Pleads that Defendants Violated Items 303 and 105 of Regulation S-K

When preparing the Registration Statement, Defendants had an independent duty under Item 303 to disclose "any known trends or uncertainties that have had or that the registrant expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).[10] Failure to comply with item 303 constitutes a violation of Section 11. *See Steckman v. Hart Brewing*, 143 F.3d 1293, 1296 (9th Cir. 1998). The Complaint alleges that Defendants violated Item 303 because they knew, but did not disclose, the imminent entry of Amazon in the online pharmacy industry and prescription drug discount market. ¶76; *see also Cai v. Switch, Inc.*, 2019 WL 3065591, at *5 (D. Nev. July 12, 2019) (plaintiff pled a violation of Item 303 when "the complaint sufficiently alleges facts from which a reasonable jury could find" the company failed to disclose a new sales strategy). Defendants argue that Amazon's imminent entry was not required to be disclosed by GoodRx. (Motion at 16;

---

[10] *See also In re NVIDIA*, 768 F.3d at 1055-56; *Steckman*, 143 F.3d at 1296.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS   CASE NO.: 2:20-cv-11444-DOC-PD

Underwriters Motion at 9.) However, here that entry is a fact that the "that the registrant expect[ed] will have a material. . . unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Therefore, Amazon's impending entry into the market is the classic fact the disclosure of which Item 303 requires.

Defendants also had an independent duty under Item 105 to "provide under the caption 'Risk Factors' a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky" and to "adequately describe[] the risk." 17 C.F.R. § 229.105; *Pirani v. Slack Techs., Inc.*, 445 F.Supp.3d at 385-386 (holding omissions required to be stated under Item 105 produce Securities Act liability). Here, the Complaint alleges the risk factors Defendants included in the Registration Statement were general and failed to disclose the imminent risk that was already occurring, namely that Amazon had plans to enter into the online pharmacy industry and prescription drug market. ¶¶65, 78. *Slack Techs*, 445 F. Supp. 3d at 386. In any event, "whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." *S.E.C. v. Todd*, 642 F.3d 1207, 1220 (9th Cir. 2011).

## C.      The Complaint Raises a Strong Inference of Scienter

To satisfy the scienter requirement of an Exchange Act claim, a complaint must allege that defendants made false or misleading statements either intentionally or with deliberate recklessness. 15 U.S.C. §78u-4(b)(2); *S. Ferry LP v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008). "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. A "'strong inference'" is one that a reasonable person would deem "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 323-24. In other words, "if two possible inferences – one fraudulent and the other non-fraudulent – are equally compelling, a plaintiff has demonstrated a strong inference of

18

scienter." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1033 (9th Cir. 2016).

Such an inference is raised here. When considered collectively, the Complaint's allegations - that GoodRx's prescription drug discount program was the Company's core business, representing more than 90% of its revenues; Defendants' closely monitored the competition to GoodRx's core business as demonstrated by their statements; Defendants were aware of Amazon's imminent competitive threat through GoodRx's partnership in InsideRx and longstanding relationship with Amazon, who GoodRx communicated with on a regular basis; and that Defendants timed the IPO just weeks before Amazon's launch of PrimeRx - support a strong inference of scienter and are sufficient to meet the PSLRA and FRCP pleading requirements.

**1.    The Importance of GoodRx's Prescription Drug Discount Program and Defendants Access to Information Support a Strong Inference of Scienter**

The Complaint alleges the requisite inference of scienter under the core operations doctrine. The core operations doctrine states that "scienter may be imputed 'based on the inference that key officers have knowledge of the 'core operations' of the company.'" *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *15 (C.D. Cal. June 9, 2016) (quoting *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 969 (N.D. Cal. 2014)). Specifically, "allegations regarding management's role 'may be sufficient, without accompanying particularized allegations, where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter.'" *Id.* (quoting *Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech*., Inc., 856 F.3d 605 (9th Cir. 2017)).

Here, Defendants Hirsch, Bezdek and Voermann were the Company's top executives and each signed the Registration Statement that repeatedly touted GoodRx's competitive advantage in the prescription drug discount market. ¶¶22-24, 37, 99. As the Complaint alleges, GoodRx's prescription drug discount program

generated over 90% of the Company's revenues and was its core business, which Defendants do not dispute. ¶38. Given the overwhelming significance of GoodRx's prescription drugs discount program to its revenues, the introduction of a competitor as large as Amazon, that had access to millions of Amazon Prime members, would be severely detrimental to the Company's business and material information to investors. *See Shankar v. Imperva, Inc.*, 2016 WL 2851859, at *8 (N.D. Cal. May 16, 2016) (finding that the "core operations" theory applies where a company's statements regarding its performance against a competitor to have "go[ne] to the heart of [the company's] business"); *EB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1133 (N.D. Cal. 2020) (finding the implementation of a discount to address competition in a segment that "represented 86% of [the Company's] worldwide revenues during the Class Period" was a fact "critical to [the] business's 'core operations'") (quoting *Killinger*, 542 F.3d at 784).

As discussed below, Defendants would have had access to Amazon's imminent launch of PrimeRx since GoodRx was a longstanding partner in InsideRx and InsideRx used GoodRx's technology platform to offer its services, including those that would be used by Amazon for PrimeRx, and regularly communicated with Amazon through Pillpack. ¶¶6, 48, 50, 123. Thus, in affirmatively telling investors in the Registration Statement that GoodRx was a "market leader with significant scale and brand advantage over competitors," and that its "partnerships across the healthcare ecosystem . . . create a deep competitive moat," Defendants must have known these statements to be misleading or they failed to make the appropriate investigation and thus were deliberately reckless in failing to disclose the Amazon's imminent entry into the market. *Reese*, 747 F.3d at 572 (finding strong inference of scienter sufficiently pled where allegations supported that defendants had access to information they discussed publicly.)

Defendants' reliance on *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415-16, 419

(9th Cir. 2020) to claim their "non-culpable" inferences are more compelling (Motion at 22), is not persuasive. Here, unlike in *Nguyen*, the Complaint alleges Defendants misled investors in order to profit from the IPO. ¶120. Indeed, by conducting the IPO before the news about Amazon was disclosed, GoodRx and its insiders were able to profit from their material misrepresentations and omissions. *Id.; Nguyen,* 962 F.3d at 415 (finding that if the complaint had alleged that defendants had "sought to profit from this scheme in the interim, such as by selling off their stock or selling the company at a premium, the theory might have more legs.") Defendants have failed to offer any non-culpable explanation other than they purportedly did not know about Amazon's plans. In contrast, from the Complaint's allegations – that Defendants knew about Amazon's imminent entry into the market based on the fact that InsideRx, who used GoodRx's platform, was also the administrator for Amazon's PrimeRx program, as well as GoodRx's material relationship with PillPack, a more plausible inference can be drawn that Defendants failed to disclose what they knew about Amazon before GoodRx's IPO in order to profit from their materially misleading misrepresentations.

### 2. GoodRx's Material Relationships With InsideRx, Express Scripts Amazon Support a Strong Inference of Sceinter

The Complaint alleges that at the time of GoodRx's IPO, Defendants were aware of Amazon's imminent launch of PrimeRx through the Company's material relationships with InsideRx, Express Scripts and Amazon. ¶¶6, 50-51, 121, 123. At the time of the IPO, not only was Express Scripts one of GoodRx's top revenue providers, Express Scripts and GoodRx were also partners in InsideRx, a pharmacy savings program that offers certain brand name medications at discount prices and was the same entity that was administering Amazon's PrimeRx program. ¶¶6, 48, 123. In fact, as part of the InsideRx partnership, GoodRx provided its technology platform to InsideRx, which was the means by which InsideRx's services were offered, including the prescription drug discount prices Amazon offered through PrimeRx. ¶123. Thus, given that InsideRx operated through GoodRx's technology platform, a plausible

21

inference can be drawn that GoodRx would have known, or at least had access to information, that InsideRx was partnering with Amazon, one of the world's largest online retail companies, to provide Prime members the identical savings that GoodRx was providing its customers. *See, e.g.*, *In re Alphabet, Inc. Sec. Litig.* 1 F.4th 687, 706 (9th Cir. 2021) (finding that material business relationship between holding company and internet search engine raised strong inference of holding company's knowledge of search engine's operations for purposes of scienter).

The relationship between Amazon and GoodRx at the time of the IPO also supports a strong inference of scienter. The Complaint alleges that at the time of the IPO, GoodRx had maintained at least a two-year partnership with Amazon through its subsidiary PillPack and GoodRx executives communicated frequently with Amazon. ¶51. Indeed, during a December 2020 investor call, Defendant Hirsch stated that "[the Company] communicate[s] with [Amazon] regularly," and "[GoodRx is] both personal and professional friends with PillPack." *Id.* On a separate investor call that month, Defendant Hirsch reiterated the close relationship between GoodRx and Amazon, stating, "It's not a GoodRx versus Amazon thing. They are our partners. We talk to the PillPack guys all the time. GoodRx is actually accepted at the Amazon Pharmacy." ¶112; *See Reese*, 747 F.3d at 576-77 (scienter supported by executive''s statements that were "specific" and "strongly suggest [] she had access to the disputed information").

Given the inextricable links between GoodRx and InsideRx, Express Scripts and Amazon, and the known impact of a mega-retailer like Amazon entering in the prescription drug discount market, it is implausible to suggest that Defendants were oblivious to Amazon's plan or that they did not have access to information that Amazon was preparing to launch a program that competed directly with GoodRx's core business at the time of the IPO.[11]

---

[11] The Complaint also alleges that GoodRx had a relationship with Amazon through the Company's use of Amazon's Web Services. ¶122. While this does not provide a direct connection between GoodRx and PrimeRx like the allegation concerning access to information through InsideRx, it

22

### 3.   The Timing of the Company's IPO Supports a Strong Inference of Scienter

The fact that GoodRx's IPO took place just weeks before Amazon launched its competing PrimeRx program, further supports a strong inference of scienter. *In re Imperial Credit Indus. Sec. Litig.*, 2000 WL 1049320, at *3 (C.D. Cal., Feb. 22, 2000) (finding inference of scienter supported by allegations of motive where defendants had strong incentive to inflate company's financial status "before the company fell apart"); *Fecht v. Price Co.*, 70 F.3d 1078, 1084 (9th Cir. 1995) (stating allegations that optimistic statements permitted successful stock offering further supported an inference of scienter). Due to Defendants' concealment, the Company was able to net $887 million proceeds from the sale of GoodRx common stock in the IPO and insiders Andrew Slutsky, the Company's Consumer President; Idea Men, LLC, an entity whose managing members included defendants Hirsch and Bezdek; and Spectrum Equity VII, L.P., an entity whose managing directors included defendant LeSieur, collectively sold $349 million of GoodRx common stock in the IPO. ¶120. In total, these GoodRx insiders and certain other selling stockholders collectively reaped gross proceeds of more than $369 million from the sale of GoodRx common stock in the IPO. *Id*.

Defendants make the meritless claim that the timing of GoodRx's IPO cannot support scienter because GoodRx's common stock price traded above the IPO price even after Amazon's announcement. (Motion at 22-23.) But this argument ignores that when the truth that Amazon would be competing with GoodRx was disclosed, the Company's stock dropped 23%, or $10.51 per share (artificial inflation). ¶¶104-105. If this same artificial inflation (due to Defendants' alleged fraud) was not factored into the $33 per share price of the IPO (¶56), the gross proceeds from the offering would have been reduced by over $400 million, based on a share price of $22.49 ($33 offering price - $10.51 artificial inflation multiplied by 39.8 shares sold in the IPO). Thus, by conducting the IPO just weeks before Amazon announced its competing Prime Rx

---

further fortifies the relationships GoodRx had with Amazon prior to the IPO. (*See* Motion at 22.)

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS     CASE NO.: 2:20-cv-11444-DOC-PD

product, Defendants were able to profit handsomely from their materially misleading statements and omissions. Contrary to Defendants' claim, these allegations - that Defendants took financial advantage of their materially misleading statements and omissions - are all that is needed.[12]

Defendants' claim that the IPO was simply a "routine corporate objective" (Motion at 23) that cannot support scienter, misses the mark under the facts alleged here, which must be considered holistically under *Tellabs*. As discussed above, the Complaint alleges that Defendants rushed to push out GoodRx's IPO because they knew Amazon was preparing to launch its competing PrimeRx program. And, as discussed above, in doing so defendants were able to reap over $400 million more in proceeds than if they had disclosed to investors the truth about GoodRx's competition. *In re Take-Two Interactive Sec. Litig.,* 551 F.Supp.2d 247, 275 (S.D.N.Y. 2008) ("Timing is . . .indicia of fraud where sales occur shortly after insiders allegedly learn undisclosed adverse information or made affirmative misrepresentations, or shortly before corrective disclosures are made in the market.")

Defendants' claim that the IPO sales by insiders Slutsky, Idea Men and Spectrum Equity VII, L.P. do not support scienter and must also be rejected. First, this Circuit does not adhere to a bright line test for stock sales and the degree to which they represent a defendant's holdings. *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (finding insider sales suspicious even though defendant sold only 2.1% of his holdings). Where, as here, stock sales result in an objectively substantial figure—collectively, $349 million worth of GoodRx common stock—less weight should be given to the fact that they may represent a small portion of [Defendants'] holdings. *Id.*

[12] The Complaint need not allege that Defendants' sales occurred at the Class Period's apex price. *In re Daou Sys. Inc.*, 411 F.3d 1006, 1024 (9th Cir. 2005) (finding insider sales probative of scienter even though defendant sold at a maximum price of $22.86 per share while the Class Period high reached $34.375 per share).

24

Likewise, Defendants' argument that scienter is foreclosed by the fact that the stock price rose at some point after massive insider sales, but before the full truth was revealed to the market, misses the mark. Unlike *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002), the case Defendants' cite (Motion at 24), where an insider's "missing the boat" by a ~70% stock jump did not support scienter in a vacuum, GoodRx insiders collectively sold $349 million of GoodRx common stock in the IPO at a price only 14% under the stock price post-lock-up—reaping gross proceeds of more than $369 million. *See No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.* 320 F.3d 920, 939 (9th Cir. 2003) (finding proximity of insiders' sale price of $26-$30 to stock's peak at $31 and large number and percentages of stocks traded supported finding of scienter).

### D.   The Individual Defendants are Liable as Control Persons

None of the Individual Defendants contest their control person status. Instead, they wrongly claim that Plaintiffs have not pled a predicate violation. (Motion at 25.) Because Plaintiffs have pled a predicate violation, the Section 15 and Section 20(a) claims against the Individual Defendants should necessarily stand. *See, e.g., Kendall v. Odonate Therapeutics, Inc.*, 2021 WL 3406271, at *8 (S.D. Cal. Aug. 4, 2021) (upholding a 20(a) claim when the sole reason given to dismiss was failure to plead a predicate act and the court found plaintiffs had).

## V.   CONCLUSION

For the reasons stated above, Defendants' motions should be denied in their entirety. If the Court dismisses the Complaint in whole or in part, Plaintiffs respectfully submit that the dismissal should be without prejudice and they should be granted leave to amend. *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (dismissal "without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment").

POMERANTZ LLP

*/s/ Cara David*
Jennifer Pafiti (282790)
Cara David (*pro hac vice*)
600 Third Avenue
New York, NY 10016
Telephone: 212/661-1100
212/661-8665 (fax)
jpafiti@pomlaw.com
cdavid@pomlaw.com

*Lead Counsel for Lead Plaintiffs*
*Betty Kalmanson, Lawrence Kalmanson,*
*and Shawn Kalmanson*

**BRONSTEIN, GEWIRTZ**
**& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Email: peretz@bgandg.com

*Additional Counsel for Lead Plaintiffs*
*Betty Kalmanson, Lawrence Kalmanson,*
*and Shawn Kalmanson*

ROBBINS GELLER RUDMAN
& DOWD LLP
Laurie L. Largent (153493)
Danielle S. Myers (259916)
Jennifer N. Caringal (286197)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
llargent@rgrdlaw.com
dmyers@rgrdlaw.com
jcaringal@rgrdlaw.com

26

*Lead Counsel for Lead Plaintiff*
*Janice L. Kasbaum*

27