ROBBINS GELLER RUDMAN
   & DOWD LLP
LAURIE L. LARGENT (153493)
DANIELLE S. MYERS (259916)
JENNIFER N. CARINGAL (286197)
SEAN C. McGUIRE (319521)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
llargent@rgrdlaw.com
dmyers@rgrdlaw.com
jcaringal@rgrdlaw.com
smcguire@rgrdlaw.com

Lead Counsel for Lead Plaintiff
Janice L. Kasbaum

POMERANTZ LLP
JENNIFER PAFITI (282790)
600 Third Avenue
New York, NY  10016
Telephone:  212/661-1100
212/661-8665 (fax)
jpafiti@pomlaw.com

Lead Counsel for Lead Plaintiffs
Betty Kalmanson, Lawrence Kalmanson,
and Shawn Kalmanson

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| In re GOODRX HOLDINGS, INC. SECURITIES LITIGATION | Master File No. 2:20-cv-11444-DOC-MARx |
| | CLASS ACTION |
| This Document Relates To: | LEAD PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS |
| ALL ACTIONS. | DATE:      June 6, 2022<br>TIME:       8:30 a.m.<br>COURTROOM:    9D |

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ................................................................... 1

II. STATEMENT OF FACTS ......................................................................... 2

    A. Background of GoodRx's Business ................................................. 2

    B. GoodRx's Material Relationships with Inside Rx, Express Scripts and Amazon ....................................................................... 3

    C. The IPO ......................................................................................... 3

    D. The Truth Emerges ........................................................................ 4

III. LEGAL STANDARD ............................................................................... 5

IV. ARGUMENT ........................................................................................... 7

    A. Defendants Have Not Met Their Burden to Show that Plaintiffs Cannot Recover Damages Under the Securities Act as a Matter of Law .......................................................................................... 7

    B. The FAC Adequately Alleges Defendants' Material Misrepresentations and Omissions ................................................. 10

        1. GoodRx's Statements in the Registration Statement Regarding Competition Were Misleading and Omitted Material Information About Amazon ...................................... 11

        2. GoodRx's Statements in the Registration Statement Regarding Its PBMs Were Misleading and Omitted Material Information .......................................................... 16

        3. The FAC Adequately Pleads False Statements Post-IPO ........ 17

    C. The FAC Adequately Pleads that Defendants Violated Items 303 and 105 of Regulation S-K ................................................... 18

    D. The FAC Raises a Strong Inference of Scienter ............................ 19

        1. GoodRx's Close Partnerships with Amazon and Inside Rx Raise a Strong Inference of Scienter ................................. 20

        2. The Importance of the Discount Card Business Supports a Strong Inference of Scienter ....................................... 21

        3. Timing of Defendants' IPO and Stock Sales Reinforce the Strong Inference of Scienter ......................................... 23

V. CONCLUSION ....................................................................................... 25

4895-0279-3755.v1

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Azar v. Yelp, Inc.*,
   2018 WL 6182756 (N.D. Cal. Nov. 27, 2018)........................................................25

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ................................................................13

*Beecher v. Able*,
   435 F. Supp. 397 (S.D.N.Y. 1975) ...........................................................8

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008)........................................................10, 12

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
   2020 WL 4569846 (N.D. Cal. Aug. 7, 2020)........................................................12

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002)................................................................12, 17

*Cai v. Switch, Inc.*,
   2020 WL 3893246 (D. Nev. July 10, 2020)........................................................10

*Campton v. Ignite Rest. Grp. Inc.*,
   2014 WL 61199 (S.D. Tex. Jan. 7, 2014) ........................................................8, 9

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys.*
*v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017)........................................................21

*Derr v. Ra Med. Sys., Inc.*,
   2021 WL 1117309 (S.D. Cal. Mar. 24, 2021)........................................................12

*Doyun Kim v. Advanced Micro Devices, Inc.*,
   2019 WL 2232545 (N.D. Cal. May 23, 2019) ........................................................15

*ESG Cap. Partners, LP v. Stratos*,
   828 F.3d 1023 (9th Cir. 2016)........................................................20

4895-0279-3755.v1

**Page**

*Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995)................................................................23

*Flynn v. Sientra, Inc.*,
    2016 WL 3360676 (C.D. Cal. June 9, 2016)................................... 14, 21

*Gammel v. Hewlett-Packard Co.*,
    2013 WL 1947525 (C.D. Cal. May 8, 2013).........................................15

*Grossman v. Waste Mgmt., Inc.*,
    589 F. Supp. 395 (N.D. Ill. 1984)..........................................................8

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983) ...................................................................... 6, 7

*Hildes v. Arthur Andersen LLP*,
    734 F.3d 854 (9th Cir. 2013).................................................................. 6

*Hodges v. Akeena Solar, Inc.*,
    2010 WL 3705345 (N.D. Cal. May 20, 2010) .....................................25

*In re Am. Apparel, Inc. S'holder Litig.*,
    855 F. Supp. 2d 1043 (C.D. Cal. 2012)................................................13

*In re Apple Inc. Sec. Litig.*,
    2020 WL 2857397 (N.D. Cal. June 2, 2020) .......................................12

*In re Bare Escentuals, Inc. Sec. Litig.*,
    745 F. Supp. 2d 1052 (N.D. Cal. 2010) ................................................ 1

*In re Broderbund/Learning Co. Sec. Litig.*,
    294 F.3d 1201 (9th Cir. 2002)........................................................9, 10

*In re Constar Int'l Inc. Sec. Litig.*,
    585 F.3d 774 (3d Cir. 2009) .................................................................. 7

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008)................................................. 7

- iii -

4895-0279-3755.v1

**Page**

*In re Facebook, Inc. Sec. Litig.*,
    477 F. Supp. 3d 980 (N.D. Cal. 2020)................................................................15

*In re Imperial Credit Indus., Inc. Sec. Litig.*,
    2000 WL 1049320 (C.D. Cal. Feb. 22, 2000).....................................................23

*In re Intuitive Surgical Sec. Litig.*,
    65 F. Supp. 3d 821 (N.D. Cal. 2014)...................................................................11

*In re IPO Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003)....................................................................8

*In re Lendingclub Sec. Litig.*,
    282 F. Supp. 3d 1171 (N.D. Cal. 2017) ..........................................................9, 10

*In re Merck & Co., Inc. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005) ................................................................................18

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008)...............................................................24

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014)........................................................................10, 18

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017)..............................................................................14

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)....................................................................6

*In re Snap Inc. Sec. Litig.*,
    2018 WL 2972528 (C.D. Cal. June 7, 2018)........................................6, 9, 10, 14

*In re Snap Inc. Sec. Litig.*,
    2018 WL 3816764 (C.D. Cal. Aug. 8, 2018).........................................................8

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
    2000 WL 1727405 (N.D. Cal. Sept. 29, 2000).....................................................25

4895-0279-3755.v1

**Page**

*In re Stac Elecs. Sec. Litig.*,
   89 F.3d 1399 (9th Cir. 1996) ................................................................. 13

*In re Stratosphere Corp. Sec. Litig.*,
   1 F. Supp. 2d 1096 (D. Nev. 1998) ...................................................... 15

*In re UTStarcom, Inc. Sec. Litig.*,
   617 F. Supp. 2d 964 (N.D. Cal. 2009) ................................................. 25

*In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*,
   2010 WL 4272567 (W.D. Wash. Oct. 12, 2010) ................................. 10

*In re Worlds of Wonder Sec. Litig.*,
   35 F.3d 1407 (9th Cir. 1994) ........................................................ 7, 9, 10

*In re YayYo, Inc. Sec. Litig.*,
   2021 WL 2766894 (C.D. Cal. July 2, 2021) .......................................... 7

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016) .................................................................. 14

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ................................................................. 7

*Knollenberg v. Harmonic, Inc.*,
   152 F. App'x 674 (9th Cir. 2005) .......................................................... 6

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ................................................................................ 5

*McMahan & Co. v. Wherehouse Ent., Inc.*,
   65 F.3d 1044 (2d Cir. 1995) .................................................................. 8

*Miller v. Thane Int'l, Inc.*,
   519 F.3d 879 (9th Cir. 2008) ............................................................... 16

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
   693 F.3d 145 (2d Cir. 2012) ........................................................ 8, 9, 10

- v -

**Page**

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund
v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) .................................................................... 6, 24

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) .......................................................................... 24

*Pirani v. Slack Techs., Inc.*,
   445 F. Supp. 3d 367 (N.D. Cal. 2020),
   *aff'd*, 13 F.4th 940 (9th Cir. 2021) ....................................................... 7, 14, 19

*Rubke v. Capitol Bancorp Ltd.*,
   551 F.3d 1156 (9th Cir. 2009) ............................................................................ 6

*S. Ferry LP v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ........................................................................... 19

*S.E.C. v. Mozilo*,
   2009 WL 3807124 (C.D. Cal. Nov. 3, 2009) .................................................. 18

*S.E.C. v. Talbot*,
   530 F.3d 1085 (9th Cir. 2008) ......................................................................... 13

*S.E.C. v. Todd*,
   642 F.3d 1207 (9th Cir. 2011) .................................................................... 6, 19

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
   485 F. Supp. 3d 1113 (N.D. Cal. Sept. 9, 2020) ............................................. 22

*Snellink v. Gulf Res., Inc.*,
   870 F. Supp. 2d 930 (C.D. Cal. 2012) ............................................................. 19

*Steckman v. Hart Brewing, Inc.*,
   143 F.3d 1293 (9th Cir. 1998) ......................................................................... 18

*Stocke v. Shuffle Master, Inc.*,
   615 F. Supp. 2d 1180 (D. Nev. 2009) .............................................................. 25

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) .......................................................................... 6, 20, 21, 23

- vi -

4895-0279-3755.v1

**Page**

*Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*,
   2012 WL 3835078 (N.D. Cal. Sept. 4, 2012) ........................................................ 12

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
   §77k .......................................................................................................... *passim*
   §77k(a) .................................................................................................................... 6
   §77k(e) .................................................................................................................... 8
   §78j(b) ............................................................................................................... 6, 7
   §78u-4(b)(1)(B) ................................................................................................... 10
   §78u-4(b)(2) ......................................................................................................... 19

Federal Rules of Civil Procedure

   Rule 8(a)(2) ............................................................................................................ 6
   Rule 9(b) ............................................................................................................. 6, 7

17 C.F.R.
   §229.105 .............................................................................................................. 19
   §229.303(a)(3)(ii) ............................................................................................... 18
   §240.10b-5 ........................................................................................................... 23

4895-0279-3755.v1

Plaintiffs submit this memorandum of law in support of their opposition to the motions to dismiss the first amended consolidated complaint filed by the GoodRx Defendants (the "Motion") (ECF No. 105) and the Underwriter Defendants  (the "Underwriter Motion") (ECF No. 108).[1]

## I.      PRELIMINARY STATEMENT

During the Class Period, Defendants misled investors by failing to disclose the competitive threat GoodRx's core product faced from Amazon, a threat of which Defendants were aware (or which they recklessly disregarded) given their close and longstanding business relationships with Amazon and Inside Rx, Amazon's launch partner for its competing product.  Rather than leveling with investors about Amazon's impending entry into the prescription drug discount market and acknowledging the direct threat to GoodRx's core product, Defendants misled investors by portraying GoodRx as the only large-scale player in that market and touting the supposedly unassailable competitive advantages afforded by their relationships with the PBMs who supplied those discounts.

Knowing of Amazon's impending entry and with the markets none the wiser, Defendants used this non-public information to complete the IPO mere weeks before Amazon launched its competing product, PrimeRx.  GoodRx itself took more than $1 billion from public investors in the IPO.  GoodRx's founders, defendants Hirsch and Bezdek, made over $124.5 million by unloading 3.77 million shares of GoodRx stock through their limited-liability company.  Such insider sales by Hirsch, Bezdek and others accounted for nearly a third of all stock sold in GoodRx's IPO and took $356 million from unknowing investors.

---

[1]    Capitalized terms not defined herein have the same meanings ascribed to them in the First Amended Consolidated Complaint (the "FAC") (ECF No. 100).  Plaintiffs do not contest GoodRx's Request for Judicial Notice.  *See* ECF No. 106.  The Court may not, however, "consider these documents for the truth of the matters asserted therein." *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1067 (N.D. Cal. 2010). Citations are omitted and emphasis is added unless otherwise noted.

- 1 -

4895-0279-3755.v1

Contrary to Defendants' contentions, the FAC adds additional allegations that further support falsity and scienter: allegations concerning the steps Amazon was taking before the IPO to enter the prescription drug market (¶¶44-49, 72(a));[2] allegations concerning GoodRx's relationship with Inside Rx that provide further support for Defendants' knowledge of Amazon's plans (¶¶57, 72(b)); and additional scienter allegations, including Defendants' massive unloading of GoodRx stock after the lock-up period following the IPO while in possession of material non-public information concerning Amazon's competitive expansion (¶¶123-124, 127). When viewed collectively, these additional allegations support a plausible claim that Defendants violated federal securities laws.

## II.    STATEMENT OF FACTS

### A.    Background of GoodRx's Business

GoodRx, which has been in business since 2011, is based in Santa Monica, California. ¶¶2, 4. The Company's core business is a healthcare technology platform that provides consumers with current prescription drug prices and discounts to help them find the lowest-cost pharmacy for their prescriptions. ¶2. According to the Company's website, consumers can use GoodRx's platform to save up to 80% on most prescription drugs at over 70,000 U.S. pharmacies. ¶40. While the Company also generates revenue from subscriptions, advertising and telehealth services, at the time of the IPO, GoodRx generated over 90% of its revenues from its prescription drug discount program. *Id.*

GoodRx contracts with PBMs, which provide GoodRx with negotiated drug discounts that the Company then passes to consumers. ¶2. GoodRx displays the discounted prices on its website and mobile app and generates a "GoodRx code" that allows consumers free access to the discounted prices when the code is displayed at a

---

[2]    References to "¶__" or "¶¶__" are to the FAC.

- 2 -

4895-0279-3755.v1

participating pharmacy.   ¶41.   GoodRx's prescription drug program is free to consumers; in essence, GoodRx makes money by selling its platform to PBMs.  *Id.*

### B.   GoodRx's Material Relationships with Inside Rx, Express Scripts and Amazon

Because GoodRx's revenues depend on its PBMs, the Company maintains close relationships with them and purportedly protects its interests through contract provisions that prevent the PBMs from redirecting volumes outside of GoodRx's technology platform.  ¶123.  For example, in the first half of 2020, Express Scripts, one of GoodRx's largest PBMs, accounted for more than 10% of GoodRx's revenue.  ¶124.  In May 2017, GoodRx also partnered with Express Scripts and others to launch Inside Rx, a pharmacy savings program that offers certain medications at discount prices.  ¶¶43, 124.  Inside Rx's savings program runs on GoodRx's technology platform. ¶124.  As discussed below, it was through Inside Rx that Amazon was able to offer its PrimeRx program, which launched just weeks after GoodRx's IPO.

In addition to GoodRx's direct participation in Inside Rx, the Company also had a material relationship with Amazon through PillPack, an online pharmacy Amazon acquired in 2018.  ¶58.  By the time of the IPO, GoodRx had been partnering with PillPack for two years.  *Id.*  Defendant Hirsch even asserted during an investor call that GoodRx was both "personal and professional friends" with PillPack.  ¶125.

### C.   The IPO

On August 28, 2020, GoodRx issued a press release announcing that the Company was launching an IPO.  ¶4.  On September 22, 2020, GoodRx announced the pricing of its IPO of 34.6 million shares of its Class A common stock at $33 per share.  ¶51.  Of those, 23.4 million would be offered by the Company itself, and 11.2 million – representing over 30% of the IPO stock – would be offered by defendants Hirsch and Bezdek through a limited liability company and by other GoodRx insiders and selling shareholders.  *Id.*  On September 23, 2020, GoodRx and the Underwriter Defendants conducted the IPO, ultimately selling 39.8 million shares of GoodRx

- 3 -

4895-0279-3755.v1

Class A common stock to the investing public. ¶52.  The IPO, priced at $33 per share, raised more than $1 billion in gross proceeds from public investors, with $356 million going to defendants Hirsch and Bezdek's limited liability company and other GoodRx insiders.  ¶¶8, 53-54.  Two days later, GoodRx closed the IPO – one of the largest in 2020.  ¶53.

But those who purchased in the IPO did not know something Defendants did: Amazon, with the help of Inside Rx, was entering the prescription drug discount market.  ¶5.  Instead of telling investors the truth about the forthcoming launch of Amazon's competing product, the Registration Statement repeatedly portrayed GoodRx as the only large scale player in the market.  *Id.*  For example, it said: "Our partnerships across the healthcare ecosystem, scale and strong consumer brand create a deep competitive moat that is reinforced by our proprietary technology platform" (¶65).; "We are a market leader with a significant scale and brand advantage over our competitors.  Our growth accelerates self-reinforcing network effects that further strengthen our competitive position" (¶66).; The Company had competitive strengths such as a "Leading Platform," a "Trusted Brand," a "Scaled and Growing Network," "Consumer-focus," an "Extensible Platform" and a "Cash Generative Monetization Model" (¶67).; "The size of our database, combined with our proprietary platform, allows us to present highly competitive prices to consumers" (¶68).; and "For many of our PBM partners, we are their only significant direct-to-consumer channel.  To date, we have retained all of our PBM partners, which highlights the strength of our relationships alongside the value we deliver" (¶69).

### D.    The Truth Emerges

Once GoodRx went public, Defendants continued to stress the Company's position as the leader in the prescription drug discount market.  For example, on a November 12, 2020 conference call with investors and analysts, defendant Bezdek stated, in relevant part, "what we've seen is we have not seen sort of any competitors

- 4 -

4895-0279-3755.v1

that have really impacted our business in any way sort of historically or currently." ¶108.  Contrary to this assurance, however, just weeks after GoodRx conducted its IPO, Amazon revealed to the market what Defendants already knew – Amazon was launching PrimeRx, a prescription drug discount program almost identical to GoodRx, that would make it "simple for customers to compare prices and purchase medications for home delivery, all in one place."  ¶73.  On this news, the price of GoodRx common stock plummeted 23%, from $46.72 per share to $36.21 per share by market close on November 17, 2020, on over 23 million shares traded.  ¶75.

But GoodRx kept assuring the market Amazon was not a competition threat. ¶¶111-121.  From March 22, 2021 to May 10, 2021, while in possession of material non-public information concerning Amazon's continued expansion of its PrimeRx product (which was eventually made public on May 11, 2021), defendants Hirsch, Bezdek and Voermann collectively sold 424,632 shares of GoodRx stock reaping over $15.8 million in proceeds and through Idea Men, LLC, Hirsch and Bezdek again sold over 2.22 million shares, reaping over $80 million in proceeds.  ¶127.

Then, on May 11, 2021, Amazon announced the addition of a new feature to PrimeRx that would allow consumers to compare prescriptions at over 60,000 pharmacies nationwide.  ¶120.  On this news, GoodRx's stock price dropped another $1.06 from a close of $31.45 per share on May 10, 2021 to close of $30.59 per share on May 11, 2021 and continued to drop on May 12, 2021 to close at $29.48 per share, for a two day drop of almost 8%.  *Id.*

## III.   LEGAL STANDARD

Plaintiffs "need only allege 'enough facts to state a claim to relief that is plausible on its face.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011).  Courts must accept as true all well-pled factual allegations, draw all reasonable inferences in plaintiff's favor, and determine whether the plaintiff may be

- 5 -

entitled to relief under any reasonable reading of the complaint. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007).

"Section 11 'places a relatively minimal burden on a plaintiff.'" *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013) (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)). Liability under §11 exists if "any part of the registration statement . . . contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. §77k(a). Issuers can therefore be liable for what the registration says as well as what it leaves out. *See In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *8 (C.D. Cal. June 7, 2018) (Wilson, J.) ("*Snap I*"). No proof of scienter, reliance or loss causation is required. *See Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009).[3]

Plaintiffs' Securities Act claims do not necessarily "sound in fraud" and are, therefore, generally subject to the permissive notice pleading standards of Federal Rule of Civil Procedure ("Rule") 8(a). *See Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 683-84 (9th Cir. 2005) (finding that Rule 9(b) did not apply where "claims [were] not 'grounded in fraud' because Plaintiffs allege[d] a basis for Section 11 liability other than fraud; *i.e.*, the omission of a material fact from the Registration statement"); *see also In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) (finding careful division of §§11 and 10(b) claims, such as the one present in the instant complaint, instructive).[4] Rule 8(a)(2) requires a "short and plain statement of the claim showing that the pleader is entitled to relief." *Id.*

---

[3] To state a claim under the control-person liability provision of the Securities Act, a plaintiff must show that: (1) there is a primary violation of the Securities Act; and (2) the defendant directly or indirectly controlled the person or entity liable for the primary violation. *See S.E.C. v. Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011). The standard for 20(a) is similar. *See No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 946 (9th Cir. 2003).

[4] Additionally, even if this Court finds Rule 9(b) applies to Plaintiffs' pleading with regard to those Defendants who are named in both Securities and Exchange Act claims, it does not apply to the Underwriter Defendants, who have solely Securities

- 6 -

4895-0279-3755.v1

To state a claim under §10(b) of the Exchange Act (15 U.S.C. §78j(b)), plaintiffs must plead: "(1) a material misstatement or omission . . . ; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and (6) loss causation." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). Plaintiffs' claims under the Exchange Act must meet the heightened pleading standard of Rule 9(b).

## IV.    ARGUMENT

### A.    Defendants Have Not Met Their Burden to Show that Plaintiffs Cannot Recover Damages Under the Securities Act as a Matter of Law

The FAC alleges that Defendants violated §11 of the Securities Act of 1933 by making material misrepresentations and omissions in the Registration Statement and Plaintiffs and the putative Class were damaged as a result. Plaintiffs are not required to establish damages at the pleading stage. *Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 382 (N.D. Cal. 2020), *aff'd*, 13 F.4th 940 (9th Cir. 2021); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1168 n.40 (C.D. Cal. 2008) (citing *Herman*, 459 U.S. at 382 (same)). In fact, under §11, damages are presumed at the pleading stage. *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 785 (3d Cir. 2009). Rather, the lack of damages, as Defendants claim here, is an affirmative defense that Defendants must establish. *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1421-22 (9th Cir. 1994) ("The defendant has the burden of proof on this defense."). They cannot. As discussed below, Defendants have not met their burden of establishing that Plaintiffs cannot recover damages under §11 as a matter of law.

Under §11, plaintiffs can recover "the difference between the amount paid for the security" and either "(1) ***the value thereof as of the time such suit was brought***, *or* (2) the price

Act claims levied against them. *See, e.g.*, *In re YayYo, Inc. Sec. Litig.*, 2021 WL 2766894, at *1 n.1 (C.D. Cal. July 2, 2021).

- 7 -

4895-0279-3755.v1

at which such security shall have been disposed of in the market before suit, *or* (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than [the measure of damages defined in subsection (1)]" (some emphasis in original). *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 165 (2d Cir. 2012) (quoting 15 U.S.C. §77k(e)). Thus, in determining damages under §11, "the key is not, as the district court concluded and as defendants contend, market price; the key is value." *Id.* at 165-66.

Defendants incorrectly contend that §11's reference to "value" as of the time suit was brought is synonymous with "price" of the security on the date the lawsuit was filed, and on that basis Plaintiffs' §11 claim should be dismissed. Motion at 9-10. Not so. The "overwhelming majority of the courts in this and other Circuits analyzing the issue, including the only Court of Appeals to directly address the question, have held that 'value' and 'price' are not always identical." *In re Snap Inc. Sec. Litig.*, 2018 WL 3816764, at *2 (C.D. Cal. Aug. 8, 2018) (citing *NECA-IBEW*, 693 F.3d at 165-66; *Campton v. Ignite Rest. Grp. Inc.*, 2014 WL 61199, at *5 (S.D. Tex. Jan. 7, 2014) ("Congress' use of the term 'value,' as distinguished from the terms 'amount paid' and 'price' indicates that, under certain circumstances, the market price may not adequately reflect the security's value.")).[5]

---

[5] *See also In re IPO Sec. Litig.*, 241 F. Supp. 2d 281, 351 n.80 (S.D.N.Y. 2003) ("Section 11(e) sets the measure of damages for a plaintiff still holding her securities at the 'value' of those securities at the time of suit. 'Value,' however, is not necessarily equal to 'price,' and the determination of value is a fact-intensive inquiry. It would be inappropriate to resolve this question at the motion to dismiss stage."); *McMahan & Co. v. Wherehouse Ent., Inc.*, 65 F.3d 1044, 1048-49 (2d Cir. 1995) ("Congress' use of the term 'value,' as distinguished from the terms 'amount paid' and 'price' indicates that, under certain circumstances, the market price may not adequately reflect the security's value."); *Grossman v. Waste Mgmt., Inc.*, 589 F. Supp. 395, 416 (N.D. Ill. 1984) ("The market price of a stock is not necessarily a reliable indication of the stock's value, as illustrated by the situation in which a fraud on the market has occurred."); *Beecher v. Able*, 435 F. Supp. 397, 404-05 (S.D.N.Y. 1975) ("realistic value may be something other than market price, where the public is either misinformed or uninformed about important factors relating to the defendant-offeror's well being").

- 8 -

The fact that the GoodRx share price did not fall below the IPO offering price until *after* the filing of the initial complaint is not a basis to dismiss Plaintiffs' §11 claim as a matter of law.  Indeed, at the time the first complaint was filed in December 2020, the full truth about Amazon's entry into the market had not yet been made public.  The FAC adequately alleges that the true "value" of GoodRx's stock was not fully revealed until at least May 11, 2021, when Amazon reported a material upgrade to its PrimeRx, which made it even more competitive with GoodRx.  *See* ¶¶11, 77.  Both the November 17, 2020 and May 11, 2020 revelations about Amazon entering the market are probative of damages for Plaintiffs' §11 claim and raise a plausible inference that the value of GoodRx common stock on the date the initial complaint was filed was below the IPO price of $33 per share.  *See NECA-IBEW*, 693 F.3d at 166 (finding reasonable inference of cognizable damages based on supported allegations that value of certificates had "diminished greatly since their original offering, as ha[d] the price at which members of the Class could dispose of them").  "Where the Plaintiff has alleged facts showing that the price of the stock is not an indicator of its value, the determination of value becomes a fact-intensive inquiry that cannot be resolved at the motion to dismiss stage." *Campton*, 2014 WL 61199, at *5; *Snap I*, 2018 WL 2972528, at *8-*9.

Defendants' reliance on *In re Broderbund/Learning Co. Sec. Litig.*, 294 F.3d 1201, 1204 (9th Cir. 2002) and *Worlds of Wonder*, 35 F.3d at 1421, is unpersuasive.  As explained by Judge Alsup in *In re Lendingclub Sec. Litig.*, 282 F. Supp. 3d 1171 (N.D. Cal. 2017), neither *Worlds of Wonder* nor *Broderbund/Learning* conclusively determined that "value" equals price; "[i]nstead, each found that plaintiffs had failed to prove loss for reasons entirely unrelated to whether Section 11 damages were measured by stock price or some alternative value, and stated that damages can be

- 9 -

measured by stock price on the day suit is filed only in passing." *Lendingclub*, 282 F. Supp. 3d at 1187 n.4.[6]

Because the FAC adequately alleges damages under §11's framework by alleging that the offering price of GoodRx's common stock was artificially inflated by Defendants' misrepresentations and omissions in the Registration Statement, and that the value of the stock was not fully revealed at the time the initial complaint was filed, but was fully revealed subsequently on May 11, 2021, Plaintiffs' §11 claim cannot be dismissed as a matter of law. *NECA-IBEW*, 693 F.3d at 165-66 (finding that plaintiff, "as it was required to do, plausibly pled a cognizable injury – a decline in value – under §11"); *Snap I*, 2018 WL 2972528, at \*8 (finding that plaintiff's theory of damages under §11 that the price of Snap's IPO did not accurately represent its value, was sufficient for the complaint to survive).

**B.    The FAC Adequately Alleges Defendants' Material Misrepresentations and Omissions**

Plaintiffs' FAC adequately alleges falsity by "specify[ing] each statement alleged to have been misleading" and the "reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B).  Contrary to Defendants' claim, even if the statement is not literally false, it may still be misleading if it omits material information. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014).  A statement is false or misleading if it "would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).  The allegations need only "raise a plausible inference" that a statement was misleading.

---

[6]    The other authorities Defendants cite, which purport to rely on *Worlds of Wonder* and *Broderbund/Learning* for the claim that only price at the time of the initial complaint, not value, controls damages, are not controlling and directly contradict the weight of the case law.  *See, e.g., In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, 2010 WL 4272567 (W.D. Wash. Oct. 12, 2010).  Defendants' reliance on *Cai v. Switch, Inc.*, 2020 WL 3893246 (D. Nev. July 10, 2020) is also misplaced.  The court in *Switch* confirmed that "'value'" and "'price'" are not synonymous and that in "'fraud on the market'" cases the "'value'" analysis may be appropriate.  *Id.* at \*3.

- 10 -

4895-0279-3755.v1

*See In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 834 (N.D. Cal. 2014).  As discussed below, Plaintiffs have sufficiently alleged actionable misstatements and omissions to withstand Defendants' Motions.

> **1.  GoodRx's Statements in the Registration Statement Regarding Competition Were Misleading and Omitted Material Information About Amazon**

Defendants used GoodRx's Registration Statement to facilitate an IPO that raised over $1 billion in proceeds for the Company, Defendants and other GoodRx insiders.  The Registration Statement repeatedly touted GoodRx's competitive advantages, portraying the Company as the only large-scale player in the prescription drug discount card market.  The Registration Statement stated that GoodRx is a "market leader with significant scale and brand advantage over [its] competitors" and boasted about the Company's industry-spanning partnerships, its "deep competitive moat" and the "highly competitive prices" it offered.  ¶¶65-66, 68; *see also* ¶67.

These statements were false, misleading and omitted material facts.  In reality, at the time of the IPO, Amazon was working with Express Scripts (one of GoodRx's largest PBMs) and Inside Rx (with whom GoodRx was in partnership) to launch PrimeRx, in order to grow Inside Rx's cash pay business.  ¶¶44-49.  In the few years leading up to the IPO, Express Scripts/Inside Rx were working with Amazon to facilitate Amazon's expansion in the prescription drug market.  ¶72(a).  While investors speculated about a collaboration between Amazon and Express Scripts/Inside Rx before the IPO, Defendants knew of Amazon's intentions as they were preparing for GoodRx to go public.  ¶72(b).  As the FAC alleges, GoodRx had ongoing, multi-year business relationships with each of Express Scripts, Inside Rx and Amazon through which they communicated on a regular basis and had access to information about Amazon before investors did.  ¶¶57-58, 123-125.  As alleged in the FAC, GoodRx had a stake in Amazon and Inside Rx's partnership and received a portion of Inside Rx's fee and GoodRx provided its software to support Inside Rx's

- 11 -

platform, which was likely used for Amazon's PrimeRx. ¶124. Likewise, given the provisions restricting competition in GoodRx's PBM contracts, including with Express Scripts, the inference can be drawn that, at the very least, Defendants were notified by Express Scripts of Amazon's and Inside Rx's intentions well before Amazon publicly announced them. ¶123. These allegations are sufficient to satisfy the pleading requirements for falsity.

Defendants again argue that their statements about GoodRx's competitive advantage are non-actionable for two reasons: 1) none of the statements about competition were actually false; and 2) they are corporate puffery. First, statements are misleading, and therefore actionable, where they "give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson*, 527 F.3d at 985; *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Here, Defendants may have been "careful to be technically correct," but the statements they made about GoodRx's advantages were still misleading given the coming launch of Amazon's PrimeRx. *See Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*, 2012 WL 3835078, at *3 (N.D. Cal. Sept. 4, 2012); *see In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *16 (N.D. Cal. June 2, 2020) ("[CEO's] statement did not align with the information he possessed at the time and was therefore misleading"); *Derr v. Ra Med. Sys., Inc.*, 2021 WL 1117309, at *6 (S.D. Cal. Mar. 24, 2021) ("Both sets of statements may have been technically true, but both would mislead a reasonable investor.").

The fact that a competitor as large as Amazon, with millions of Amazon Prime members, was about to enter the market with a product that competed directly with GoodRx's core product would have been material to investors at the time of the IPO given the competitive threat Amazon posed. And contrary to Defendants' claim, simply because this fact did not become public until after the IPO does not make the allegation hindsight pleading. *See Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *8 (N.D. Cal. Aug. 7, 2020) (holding a complaint did not engage in

- 12 -

"impermissible hindsight pleading" when "defendants' statements were misleading given the information available to them at the time the statements were made"); *see also In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1068 (C.D. Cal. 2012) ("[D]efendants cannot use the mere 'incantation of fraud-by-hindsight' to 'defeat an allegation of misrepresentations and omissions that were misleading and false at the time they were made.'").  This information should have been disclosed because a reasonable investor would have considered these facts important in determining whether to buy or sell GoodRx stock.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988); *S.E.C. v. Talbot*, 530 F.3d 1085, 1097 (9th Cir. 2008).

Defendants' reliance on *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399 (9th Cir. 1996) is misplaced; that case does not say, as Defendants suggest, that no company ever needs to disclose information about another company.  In *Stac*, the complaint alleged "that Stac went public knowing, but without disclosing, that Microsoft was about to come out with a competitive product (a new version of DOS incorporating Stacker-like data compression capabilities) that would take away Stac's market." *Id.* at 1402-03.  The court found that Stac in fact had a disclosure directly about Microsoft.  *Id.* at 1406.  But that is not the case here, as GoodRx made no such warnings about Amazon.  In fact, as detailed *supra*, GoodRx's materials essentially said it had no real competition.  *See, e.g.*, ¶71 ("[O]ur competition is fragmented and consists of competitors that are smaller than us in scale.").

Defendants' argument that the competition statements are inactionable corporate puffery is equally meritless because it ignores the context in which they were made.  Motion at 11-12.  At the time of the IPO, the portrayal of GoodRx as the only large scale discount prescription drug service in the market was of key importance to investors.  ¶¶61-62.  Analysts who initiated coverage of GoodRx following the IPO noted the importance of GoodRx's competitive advantage and the potential risk to the Company if a large retail competitor such as Amazon were to enter the prescription drug discount card market.  *Id.*  For example, shortly after the

- 13 -

4895-0279-3755.v1

IPO, Deutsche Bank issued a report initiating coverage with a target price of $50 per share, noting that: "GoodRx does not face a lot of competition . . . ."; the "company is the only scale player in prescription drug price comparison"; and GoodRx "is the leader (by a large margin) among pharma discount card providers in the country." ¶61. The Deutsche Bank report also noted that a key risk to GoodRx's story was that "other internet players (*e.g.* Amazon or Google) [could] get into the price discovery market for drugs and/or provide heavily discounted drugs themselves." *Id.*; *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 98 (2d Cir. 2016) ("Some statements, in context, may amount to more than 'puffery' and may in some circumstances violate the securities laws . . . ."). Here, GoodRx's statements about their "deep competitive moat" and "brand advantage over our competitors" (¶¶65-68) are misleading in context because at the time they were spoken, GoodRx knew that Amazon, a competitor with an overall brand advantage over it, was about to launch a competing product. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142-44 (9th Cir. 2017) (statements not puffery because they "'affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]'").

Likewise, Defendants' generic risk disclosures do not absolve them of their duty to disclose. The Registration Statement only offered investors the generic statement that the Company "***may*** face increased competition from those that attempt to replicate [its] business model or marketing tactics, such as discount websites, apps, cash back and loyalty programs and new comparison shopping sites from various industry participants, any of which ***could*** impact [its] ability to attract and retain consumers." ¶71. This boilerplate warning is plainly insufficient when Defendants knew very well it ***would*** occur. *See, e.g.*, *Pirani*, 445 F. Supp. 3d at 386; *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *10-*12 (C.D. Cal. June 9, 2016) (boilerplate warning is misleading where, as here, specific conditions known but concealed have caused the risk to manifest or made it significantly more likely); *Snap I*, 2018 WL

- 14 -

4895-0279-3755.v1

2972528, at *6 (finding that hypothetical risk disclosures are insufficient to absolve defendants of their duty to disclose).

The cases Defendants cite on this point are distinguishable.  In *Doyun Kim v. Advanced Micro Devices, Inc.*, 2019 WL 2232545, at *7 (N.D. Cal. May 23, 2019), the court found it significant that plaintiffs did not allege that "when Defendants filed the risk disclosures they had any contemporaneous reasons to believe" that what occurred was "remotely likely."  Here, the FAC clearly alleges that Defendants knew Amazon was launching a discount prescription drug service and GoodRx would face more competition.  Likewise in *In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1017-18 (N.D. Cal. 2020), the court found certain risk disclosures not actionable because either: (a) the statements warned of "reputation, business, or competitive harm, ***not*** improper access to or the disclosure of user data," when the company was alleged to have information about disclosure of user data at the time; or (b) investors "had all of the information they needed to evaluate" the statement at issue.  *Id.* at 1019 (emphasis in original).  Neither of these is applicable in a case such as this where the Company had non-public information related directly to the risk warning – and yet failed to disclose it.

Finally, the short time between the IPO and Amazon's entry into the market is a further indication that Defendants' statements were false when made.  The announcement of Amazon Pharmacy and PrimeRx came only seven weeks after the IPO.  *See*, *e.g.*, *Gammel v. Hewlett-Packard Co.*, 2013 WL 1947525, at *44 (C.D. Cal. May 8, 2013) (finding the temporal proximity between various of defendants' statements and a corrective disclosure, four to eleven weeks, supported plaintiffs' falsity allegations); *see also In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1112 (D. Nev. 1998) (same).

- 15 -

4895-0279-3755.v1

## 2. GoodRx's Statements in the Registration Statement Regarding Its PBMs Were Misleading and Omitted Material Information

The Registration Statement also misleadingly assured investors that GoodRx had locked up relationships with its PBMs at the time of the IPO, stating that: "For many of our PBM partners, we are their only significant direct-to-consumer channel. To date, we have retained all of our PBM partners, which highlights the strength of our relationships alongside the value we deliver." ¶69. Similarly, the Registration Statement touted that GoodRx had protective contract provisions in place with its PBMs that "prevent PBMs from circumventing our platform, [or] redirecting volumes outside of our platform" and that GoodRx's PBM contracts "restrict the ability of PBMs to compete with us and solicit our customers." ¶70. These statements, too, were materially misleading and omitted material information.

The FAC alleges that at the time of the IPO, Amazon was teaming up with Express Scripts, one of GoodRx's largest PBMs, and Inside Rx, to launch PrimeRx, which would compete directly with GoodRx's core product. In fact, it would be Inside Rx, through its affiliation with Express Scripts, that would be working with Amazon to offer the very same prescription drug discounts that GoodRx's platform was offering its customers at the time of the IPO. The statements in the Registration Statement that GoodRx's PBMs were restricted from competing with the Company or soliciting its customers, and that GoodRx was the only "significant direct-to-consumer channel" for its PBMs led investors to believe GoodRx had minimal, if any, competitive risks when in fact that was not true.

Defendants argue that these statements are not actionable because the statements were not a prediction of future stability. But this ignores the context in which the statements were made. *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) ("[S]tatements literally true on their face may nonetheless be misleading when considered in context."). Here, Defendants' statements about the Company's

- 16 -

4895-0279-3755.v1

relationship with its PBMs, including Express Scripts, assured investors that GoodRx had little, if any, competitive risk because its PBM contracts restricted competition from the PBMs and GoodRx was the only significant channel for its PBMs to reach consumers directly.  Given that investors placed significant importance on GoodRx's competitive advantage in valuing the Company at the time of the IPO (¶61), Plaintiffs have sufficiently alleged that these statements "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Brody*, 280 F.3d at 1006.

### 3. The FAC Adequately Pleads False Statements Post-IPO

The FAC alleges that, after the IPO, Defendants made several misleading statements in which they downplayed the threat Amazon was continuing to pose and continued to omit material information about Amazon's further development of its competing PrimeRx product.  ¶¶108, 112-117.  Indeed, in May 2021, Amazon announced the addition of a new feature to its PrimeRx product that, like GoodRx, allows consumers to compare prescription prices at over 60,000 pharmacies nationwide, essentially replicating GoodRx's product with the help of Inside Rx. ¶120.  In response to Amazon's news, GoodRx's stock price dropped another $1.06 from a close of $31.45 per share on May 10, 2021 to close of $30.59 per share on May 11, 2021 and continued to drop on May 12, 2021 to close at $29.48 per share, for a two day drop of almost 8%.  *Id.*

As with Defendants' pre-IPO statements, Defendants' post-IPO statements were misleading because Defendants, through GoodRx's partnerships with Express Scripts and Inside Rx, continued to receive information about the development of Amazon's competing PrimeRx product and that, despite Defendants' denial, Amazon continued to pose a competitive threat to GoodRx as it was aggressively turning up its efforts to compete with GoodRx.  ¶118.  And it was through Amazon's partnership with Inside Rx (also a partner of GoodRx) that allowed Amazon to do so.  The FAC alleges that

- 17 -

4895-0279-3755.v1

GoodRx and Express Scripts were closely partnered and working together as co-founders of Inside Rx and in turn, Inside Rx administered Amazon's PrimeRx program and used GoodRx's software. ¶¶7, 43, 57, 124. In fact, under Inside Rx and Amazon's partnership, Inside Rx would be reimbursed a flat fee from pharmacies to administer Amazon's prescription discount program, while GoodRx would get a portion of the fee. ¶57. Moreover, the materiality to investors of a competitor the size of Amazon, with access to millions of Prime members, was demonstrated when GoodRx's stock dropped another 8% in May 2021 when Amazon made the announcement showing it was taking more aggressive steps to compete with GoodRx. ¶56. *See In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 274 (3d Cir. 2005) (materiality "'may be measured post hoc by looking to the movement, in the period'"); *S.E.C. v. Mozilo*, 2009 WL 3807124, at *10 (C.D. Cal. Nov. 3, 2009) (same). These allegations are sufficient to show how Defendants knew about Amazon's plans and that their post-IPO statements were materially misleading.

**C.     The FAC Adequately Pleads that Defendants Violated Items 303 and 105 of Regulation S-K**

Defendants again argue that Amazon's impending entry into the discount prescription drug market was not required to be disclosed under Items 303 and 105 of Regulation S-K. When preparing the Registration Statement, Defendants had an independent duty under Item 303 to disclose "any known trends or uncertainties that have had or that the registrant expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(3)(ii).[7] Here, the FAC alleges that Defendants violated Item 303 because they knew, but did not disclose, Amazon's forthcoming entry into the discount prescription drug market, which was likely to have a negative impact on GoodRx's revenues. Indeed, in the quarter following Amazon's launch of PrimeRx, GoodRx

---

[7]   *See also In re NVIDIA*, 768 F.3d at 1055-56; *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998).

- 18 -

was forced to give lower than expected revenue guidance for the first quarter of 2021 and reported "Monthly Active Consumers" trends for the quarter that caused analysts concern about weaker utilization trends for GoodRx going forward.  ¶119.  These allegations confirm that Amazon's impending entry into the market, which the FAC alleges Defendants knew about, is the very type of disclosure required by Item 303. *Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 940 (C.D. Cal. 2012) ("[T]he goal of Regulation S-K is to require disclosure of all information material to investors' understanding of a registrants business.").

For the same reasons, Defendants also had an independent duty under Item 105 to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and to "adequately describe[] the risk."  17 C.F.R. §229.105; *Pirani*, 445 F. Supp. 3d at 385-86 (holding omissions required to be stated under Item 105 produces Securities Act liability).  Here, the FAC alleges that the risk factors Defendants included in the Registration Statement were general and failed to disclose the imminent risk that was already occurring, namely that Amazon had plans to enter into the online pharmacy industry and prescription drug market.  ¶¶71, 84.  *Pirani*, 445 F. Supp. 3d at 386.  In any event, "'whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact.'" *Todd*, 642 F.3d at 1220.

**D.    The FAC Raises a Strong Inference of Scienter**

The FAC alleges that Defendants made misleading and material omissions statements either intentionally or with deliberate recklessness – and thus have done enough to satisfy the Exchange Act's pleading requirements.  *See* 15 U.S.C. §78u-4(b)(2) (requiring plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"); *S. Ferry LP v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008) (finding the standard met).  "The inquiry is whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that

- 19 -

standard." *Tellabs*, 551 U.S. at 322-23 (emphasis in original).  If "two possible inferences – one fraudulent and the other nonfraudulent – are equally compelling, a plaintiff has demonstrated a strong inference of scienter." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1033 (9th Cir. 2016).

Defendants have conceded – as they must – that Inside Rx was "Amazon's exclusive PBM" (Motion at 21); and that defendants Hirsch, Bezdek and LeSieur, and corporate insider Andrew Slutsky, sold stock in the IPO prior to Amazon's announcement (*id.* at 21-22).  Plaintiffs have additionally alleged that GoodRx's prescription drug discount program accounted for over 90% of its revenues, making the discount program the core business (¶123); that GoodRx was a launch partner of Inside Rx (¶115); that GoodRx continued to collaborate with Amazon up through the IPO date (¶¶7, 58, 72, 125); that GoodRx's IPO came immediately prior to Amazon's announcement of its PrimeRx product (¶¶63-64); and that these individuals made more than $369 million in net proceeds from the sale of their shares of GoodRx common stock in the IPO (¶104).  The question at this stage of the litigation is not whether Plaintiffs have actually proven scienter – that will come later, after discovery and a chance to develop the record.  The question at this phase is whether Plaintiffs have pled facts that, taken together, raise a "cogent" inference of scienter – one that is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 323-24.  Plaintiffs have met that standard here.

### 1. GoodRx's Close Partnerships with Amazon and Inside Rx Raise a Strong Inference of Scienter

Plaintiffs have alleged that Defendants were aware, at the time of the IPO, of Amazon's plans to launch a directly competing service.  ¶¶6-7, 55-58, 72, 124-125. GoodRx provided its software to support Inside Rx's platform – meaning that GoodRx must have been aware of what the use case for the software would be – and Inside Rx, in turn, administered Amazon's PrimeRx program.  ¶¶7, 55, 124.  Meanwhile, GoodRx and Express Scripts were closely partnered and working together as co-

- 20 -

founders *of Inside Rx*.  ¶¶7, 43, 57, 124.  The lines between these entities were not sharp: given that Inside Rx administered Amazon's PrimeRx program, *and used GoodRx's software*, a "cogent" and "as compelling" inference is that GoodRx became aware of the PrimeRx launch and timed its own IPO to generate as much revenue as possible before Amazon's announcement.  *See Tellabs*, 551 U.S. at 323-24.

Moreover, Amazon and GoodRx *themselves* had direct relationships with each other, separate and apart from their close collaboration by proxy through Inside Rx, Express Scripts and PillPack.  At the time of the IPO, the GoodRx-Amazon collaboration had been ongoing for about two years, and during a December 2020 conference call, defendant Hirsch stated that GoodRx "communicate[s] with [Amazon] regularly," and that GoodRx is "both personal and professional friends with PillPack."  ¶¶58, 125.  On a separate investor call that month, defendant Hirsch reiterated the close relationship between GoodRx and Amazon, stating: "It's not a GoodRx versus Amazon thing.  They are our partners.  We talk to the PillPack guys all the time.  GoodRx is actually accepted at the Amazon Pharmacy."  ¶117.

### 2. The Importance of the Discount Card Business Supports a Strong Inference of Scienter

Where a particular issue "'is of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter,'" the core operations doctrine allows the Court to infer scienter even in the absence of specific evidence establishing that a particular individual knew a particular fact.  *Flynn*, 2016 WL 3360676, at *15.  The core operations doctrine can sometimes apply with regard to a defendant's knowledge of a business other than his or her own.  *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 620-21 (9th Cir. 2017) (Observing that, "[w]ith respect to [a third party]'s financial results and changes in the market during the Class Period, Defendants cannot contest knowledge of these facts, as they are drawn from [Defendants'] SEC filings and press releases," but finding plaintiffs had not established scienter for different reasons.).

- 21 -

It is undisputed that GoodRx's discount card program was essential to its business, comprising over 90% of the Company's revenues. Defendants, as corporate officers, had a duty to remain as informed as possible about the competitive landscape of that core business. Defendants Hirsch, Bezdek and Voermann each signed the Registration Statement that repeatedly assured investors of GoodRx's competitive advantage in the discount drug market. Plaintiffs have alleged, therefore, that Defendants knew, or were reckless in not knowing, that the introduction to the market of a massive competitor like Amazon would be detrimental to their business. *See SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1133 (N.D. Cal. Sept. 9, 2020) (crediting plaintiff's allegation on a "core operations" theory that defendants must have been aware of the company's own practices designed to address competition, where the core operation in question generated 86% of the company's revenue).

The close cooperation between, and routine communication among, GoodRx, Inside Rx, PillPack and Amazon, suggests that GoodRx's statements regarding its "deep competitive moat" and "advantage over competitors" were false and misleading when made. *See* ¶¶65-68. Defendants either knew the statements were false when made, or were reckless in failing to make the appropriate investigation into whether those statements were true before making them.

Defendants attempt to dismiss these allegations as "boilerplate," and quizzically argue that the core operations doctrine applies only to a defendant's statements about its own company. Motion at 23-24. But that is what Plaintiffs allege. Defendants' statements regarding GoodRx's "deep competitive moat" *is* a statement about GoodRx – and implies that Defendants only made that statement because they knew something valuable about their competitive position with respect to other companies. As it turns out, though, that statement was not true when made, which means – by definition – that Defendants did not do enough to verify whether it was true when they made it. In other words, to avoid the risk of securities fraud liability, Defendants needed to either

- 22 -

4895-0279-3755.v1

verify that the statement was true before making it, or avoid making it at all. *See* 17 C.F.R. §240.10b-5 ("It shall be unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . .").

### 3. Timing of Defendants' IPO and Stock Sales Reinforce the Strong Inference of Scienter

GoodRx launched its IPO mere weeks before Amazon's launch of its PrimeRx program – a direct competitor. The timing alone, if left unexplained, further supports an inference of scienter. *In re Imperial Credit Indus., Inc. Sec. Litig.*, 2000 WL 1049320, at \*3 (C.D. Cal. Feb. 22, 2000) (finding inference of scienter supported by allegations of motive where defendants had strong incentive to inflate company's financial status "before the company fell apart"); *Fecht v. Price Co.*, 70 F.3d 1078, 1084 (9th Cir. 1995) (finding scienter adequately alleged where optimistic statements permitted a successful stock offering). The Company netted $887 million in proceeds from the sale of GoodRx common stock in the IPO at an inflated price, and insiders – including the Company's consumer division president and an entity managed by Hirsch and Bezdek, and another entity managed by defendant LeSieur – collectively sold $349 million of GoodRx common stock during the IPO. In total, these GoodRx insiders and certain other selling stockholders collectively reaped gross proceeds of more than $369 million from the sale of GoodRx common stock during the IPO. After Amazon's announcement, GoodRx's stock price dropped 23%, or $10.51 per share.

Defendants have failed to offer any non-culpable explanation for the timing of the IPO and of the Defendants' and insiders' stock sales; the inference that they knew of the impending Amazon announcement, therefore, is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Defendants make only a barefaced assertion that the timing of the stock sales is

- 23 -

4895-0279-3755.v1

in fact ***not*** suspicious because "these stockholders would have made more money" if they had held the stock for a bit longer – but that is irrelevant.  Motion at 22.  When determining whether insiders' stock sales support an inference of scienter, courts look to "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading practices." *In re New Century*, 588 F. Supp. 2d 1206, 1232 (C.D. Cal. 2008). Whether the insiders would have made ***more*** by holding slightly longer before selling is irrelevant – as it should be, since nobody can predict the future with precision.  *See Am. W.*, 320 F.3d at 939 (finding adequate allegations of scienter even though insiders' stock sales had missed the peak price of $31).  Here, the uncontested facts speak for themselves: insiders made $369 million (factor 1), immediately prior to a major competitor's announcement that it was entering the market (factor 2), in a manner inconsistent with prior sales (factor 3).  And the evidence does not need to be conclusive or egregious – indeed, Plaintiffs do not allege insider trading claims on their own – to support an inference of scienter. *See New Century*, 588 F. Supp. 2d at 1232 ("Although not the strongest set of allegations of insider trading and suspicious compensation, the Court finds that the motive allegations offer minimal additional support for a conclusion of scienter.").  Nor does it matter that the sellers retained some portion of their holdings: where stock sales result in an objectively substantial amount of proceeds – here, $349 million – less weight should be given to the fact that the sales total a small portion of their overall holdings.  *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (finding insider sales suspicious even though defendant sold only 2.1% of his holdings).

Finally, the FAC alleges that the stock sales made after the expiration of the lock-up period additionally support an inference of scienter.  ¶127.  In the 180 days following the IPO, Defendants collectively made nearly $96 million from selling GoodRx stock prior to Amazon's announcement of the expansion of PrimeRx.  *Id.* Defendants misleadingly cite a single case to bolster their argument that post-lock-up

- 24 -

sales are immune from scrutiny. Motion at 23 (misunderstanding the holding of *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000 WL 1727405, at \*12 (N.D. Cal. Sept. 29, 2000)). Defendants claim the court in *Splash* held that "sale of 65% of stock holdings [was] not suspicious where sales came directly after expiration of lock-up agreement." Motion at 23. Not quite. In *Splash*, the court considered sales by a defendant, Radius, of "almost 60% of its holdings" (not 65%) and determined that, while "the amount and percentage of shares sold by Radius strongly suggest scienter, a contextual analysis casts these sales in a different light" because of the "lock-up 180 day restraint." *Splash*, 2000 WL 1727405, at \*12. Nonetheless, the court wrote, "[o]n a motion to dismiss, sales made at a time or in an amount arousing suspicion are entitled to that sinister inference on plaintiffs' behalf even if the defendant can provide another frame from which to consider the events in question," but found that plaintiffs had not met their burden. *Id.* at \*13. The court plainly did ***not*** hold – as Defendants imply – that sales made after the expiration of a lock-up period are never suspicious.[8]

## V.  CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss should be denied in their entirety.

DATED: April 14, 2022

s/ LAURIE L. LARGENT
LAURIE L. LARGENT

---

[8] Defendants' claim that their sales were made pursuant to 10b5-1 trading plans is irrelevant at the pleading stage because it is an affirmative defense. Motion at 23. *See Azar v. Yelp, Inc.*, 2018 WL 6182756, at \*18-\*19 (N.D. Cal. Nov. 27, 2018) ("Without reviewing [defendants'] actual trading plan, the Court cannot determine whether these [10b5-1 good-faith] requirements were met, and cannot conclude that the plan negates any inference of scienter."); *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1193 (D. Nev. 2009) ("'[A] 10b5-1 trading plan does not provide an absolute defense to a claim of insider trading. Rather, it requires an additional factual finding of good faith,'" which is in appropriate at the motion to dismiss stage.); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 n.16 (N.D. Cal. 2009) (same); *Hodges v. Akeena Solar, Inc.*, 2010 WL 3705345, at \*6 (N.D. Cal. May 20, 2010) ("the factual question of whether Defendant Cinnamon sold his stock pursuant to such an agreement is an issue appropriately resolved on summary judgment"). Tellingly, while they did include their Forms 4, Defendants fail to include their purported 10b5-1 trading plans in their request for judicial notice.

- 25 -

4895-0279-3755.v1

ROBBINS GELLER RUDMAN
  & DOWD LLP
LAURIE L. LARGENT
DANIELLE S. MYERS
JENNIFER N. CARINGAL
SEAN C. McGUIRE
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
llargent@rgrdlaw.com
dmyers@rgrdlaw.com
jcaringal@rgrdlaw.com
smcguire@rgrdlaw.com

Lead Counsel for Lead Plaintiff
Janice L. Kasbaum

JOHNSON FISTEL, LLP
FRANK J. JOHNSON
655 West Broadway, Suite 1400
San Diego, CA  92101
Telephone:  619/230-0063
619/255-1856 (fax)
franki@johnsonfistel.com

Additional Counsel for Lead Plaintiff
Janice L. Kasbaum

POMERANTZ LLP
JEREMY LIEBERMAN
BRENDA SZYDLO
(admitted *pro hac vice*)
600 Third Avenue
New York, NY  10016
Telephone:  212/661-1100
917/463-1044 (fax)
jalieberman@pomlaw.com
bszydlo@pomlaw.com

POMERANTZ LLP
JENNIFER PAFITI
1100 Glendon Avenue, 5th Floor
Los Angeles, CA  90024
Telephone:  310/432-8492
jpafiti@pomlaw.com

Lead Counsel for Lead Plaintiffs
Betty Kalmanson, Lawrence Kalmanson,
and Shawn Kalmanson

- 26 -

4895-0279-3755.v1

BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
PERETZ BRONSTEIN
60 East 42nd Street, Suite 4600
New York, NY  10165
Telephone:  212/697-6484
212/697-7296 (fax)
peretz@bgandg.com

Additional Counsel for Lead Plaintiffs Betty Kalmanson, Lawrence Kalmanson, and Shawn Kalmanson

4895-0279-3755.v1

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on April 14, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ LAURIE L. LARGENT
LAURIE L. LARGENT

ROBBINS GELLER RUDMAN
&  DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  llargent@rgrdlaw.com

4895-0279-3755.v1

# Mailing Information for a Case 2:20-cv-11444-DOC-MAR R. Brian Terenzini v. GoodRx Holdings, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Adam Marc Apton**
  aapton@zlk.com

- **Jennifer N Caringal**
  jcaringal@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Brian Edward Cochran**
  bcochran@rgrdlaw.com,e_file_sd@rgrdlaw.com,kwoods@rgrdlaw.com

- **Jordan Davisson Cook**
  jordan.cook@lw.com,#ocecf@lw.com,jordan-cook-5273@ecf.pacerpro.com

- **J. Alexander Hood , II**
  ahood@pomlaw.com,abarbosa@pomlaw.com

- **Frank J Johnson**
  frankj@johnsonfistel.com,michaelf@johnsonfistel.com,paralegal@johnsonfistel.com,jonathans@johnsonfistel.com,brettm@johnsonfistel.com

- **Michele D Johnson**
  michele.johnson@lw.com,michele-johnson-7426@ecf.pacerpro.com,#ocecf@lw.com,jana.roach@lw.com

- **Phillip Kim**
  pkim@rosenlegal.com,pkrosenlaw@ecf.courtdrive.com

- **Laurie L Largent**
  llargent@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Sean C McGuire**
  smcguire@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Virginia F Milstead**
  virginia.milstead@skadden.com,shannon.cooper@skadden.com,nandi.berglund@skadden.com,dlmlclac@skadden.com

- **Peter Bradley Morrison**
  peter.morrison@skadden.com,DLMLCLAC@skadden.com

- **Danielle S Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,aba,jalieberman@pomlaw.com,abarbosa@pomlaw.com,fgravenson@p

- **Laurence M Rosen**
  lrosen@rosenlegal.com,lrosen@ecf.courtdrive.com

- **Colleen C Smith**
  colleen.smith@lw.com,colleen-c-smith-7786@ecf.pacerpro.com

- **Jennifer Banner Sobers**
  jbsobers@pomlaw.com

- **Brenda Szydlo**
  bszydlo@pomlaw.com,abarbosa@pomlaw.com

- **Matthew L. Tuccillo**
  mltuccillo@pomlaw.com

- **David C Walton**
  davew@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)